**CSX TRANSPORTATION, INC., Its Affiliates and Subsidiaries**

v.

**DELAWARE COUNTY BOARD OF ASSESSMENT APPEALS.**

**Appeal of: Chichester School District.**

**CSX Transportation, Inc., Its Affiliates and Subsidiaries, Appellant**

**Property Located at 329 Bethel Ave., Chichester, Upper Chichester Twp., Delaware County, PA 19014**

**Tax Folio Number: 09–00–01050–10.**

**Upper Chichester Township**

v.

**Delaware County Board of Assessment Appeals.**

Commonwealth Court of Pennsylvania.

Argued Oct. 7, 2014.
Decided Nov. 19, 2014.

John E. Van Allen, Harrisburg, for designated appellant CSX Transportation, Inc.

Stephen J. Polaha, Media, for designated appellee Chichester School District.

BEFORE: ROBERT SIMPSON, Judge, and PATRICIA A. McCULLOUGH, Judge, and ANNE E. COVEY, Judge.

OPINION BY Judge COVEY.

CSX Transportation, Inc., its affiliates and subsidiaries (collectively, CSXT) and Intervenor Chichester School District (School District) cross-appeal from the Delaware County Common Pleas Court's (trial court) December 30, 2013 order (Order) affirming the Delaware County Board of Assessment Appeals' (Board) determination that the property in question was taxable, but holding that a 7.883 acre portion of a 72.63 acre property is exempt from local real estate taxes.

█ CSXT, a wholly-owned subsidiary of CSX Corporation, provides transportation services through a 21,000–mile railroad network. It is regulated by the United States Surface Transportation Board and the Pennsylvania Public Utility Commission, and is subject to the act commonly known as the Pennsylvania Public Utility Realty Tax Act (PURTA).[1] CSXT owns property located at 329 Bethel Avenue, Upper Chichester Township, Delaware County, Pennsylvania by virtue of a Certificate of Merger under which the Baltimore and Philadelphia Railroad Company (B & PRC) merged with CSXT. B & PRC had acquired 62.32 acres of land from Sun Refining and Marketing Company on January 30, 1985 and 27.88 acres of land from Transco Development Company on February 14, 1985 (the Property). The Property is reflected on Delaware County Tax Map No. 09–16–065–000. Folio No. 09–001050–10 (Folio 10) and Folio No. 09–00–01050–50 (Folio 50) were assigned to that tax map.[2]

Essentially, the issues for this Court's review are: (1) whether the Property is used or useful in furnishing a public utility service, and if so, whether it is constitutionally exempt from local real estate taxes; (2) whether the Property is "utility realty," as defined by PURTA; (3) whether the Property is land owned by a railroad as a right-of-way and is exempt from local real estate and PURTA taxes; (4) whether the trial court properly determined the taxable market value of the Property; and, (5) whether the trial court properly found that the Property is composed of 72.63 acres and has rails on it.

1. Article XI–A of the Tax Reform Code of 1971, Act of March 4, 1971, P.L. 6, *as amended*, added by Section 3 of the Act of July 4, 1979, P.L. 62, 72 P.S. §§ 8101–A–8110–A.

2. In 1999, B & PRC appealed to the trial court from a Board decision which denied B & PRC's petition to reclassify a portion of the Property identified as Folio 10 as exempt from local taxation and PURTA as a railroad bed and right-of-way. The appeal was later settled pursuant to a Stipulation (Stipulation) which, for the period 2000 through 2009, assigned a total assessed property value of $8,908,500.00, $1,408,500.00 (representing the railroad tracks and the land thereunder) of which was exempted from local and PURTA taxation, and $7,500,000.00 was deemed the assessed taxable value. On October 25, 2004, the trial court approved the Stipulation and incorporated the terms thereof into its order. Board records reflect that on November 10, 2004, Folio 50 was created with an assessed but exempted value of $1,408,500.00. Board records also reveal that on November 3, 2004, Folio 10's assessed value was decreased to $7,500,000.00. Thus, it appears that prior to November 2004, Folio 10 encompassed the entire Property.

After review, we affirm in part and reverse in part.

The parties' stipulated facts which described CSXT's use of the Property are as follows:

18. CSXT receives automobile shipment orders from major automobile manufacturers, including General Motors, Ford, Chrysler, Nissan, Hyundai, Kia and Volkswagen, to transport automobiles by rail.

19. The automobiles to be transported are loaded onto rail cars owned by CSXT and many other railroads, including Norfolk Southern, Union Pacific, Burlington Northern Santa Fe, Canadian Pacific, and Canadian National Railway Company, as it is industry practice for one railroad to use other railroads['] rail cars.

20. Upon arrival, the automobiles are unloaded by third[-]party contractors from CSXT's trains and the unloaded automobiles are moved to assigned parking bays or spaces on the Property. Automobile and parking bay or space information is electronically transmitted to PUC-regulated Common Carrier auto transporters ( [ ]Common Carriers[ ] ).

21. The Common Carriers, which operate pursuant to subleases, plan vehicle loads and assign those planned loads to drivers.

22. Common Carrier drivers load the automobiles onto automobile transport trailers, submit required documentation to the facility's security personnel, and exit the facility with those loaded automobiles.

23. Automobiles transported from the Property are distributed by the Common Carriers to automobile retailers located primarily in the Philadelphia and New Jersey area.

24. On average, 67 rail cars containing 842 automobiles are unloaded each day.

25. The average turnover time between the unloading of an automobile from a rail car and its departure from the Property via the Common Carriers is about 24 to 48 hours.

26. There are four buildings located on the Property having a combined area of 9,545 square feet.

27. Approximately 9,000 feet of electric fencing surrounds and encloses almost all of the Property.

28. 60.918 acres of the Property are paved with macadam.

29. By a lease dated September 1, 1998 ( [ ]Lease CSX–033616[ ] ), CSXT leased 84.5 acres to Total Distribution Services, Inc. ( [ ]TDSI[ ] ), an affiliate of CSX and a wholly-owned subsidiary of CSX Corporation.

30. Through a supplemental agreement dated September 21, 2011, CSXT and TDSI supplemented Lease CSX–033616 to reflect a correct lease area of 81.25 acres.

31. Through an Automobile Terminal Operations Agreement, effective April 15, 2009, TDSI engaged third-party contractor Auto Logistics Providers, LLC ( [ ]ALP[ ] ) to provide automobile loading and unloading services at the facility.

32. Under the Automobile Terminal Operations Agreement, ALP is responsible for unloading inbound automobiles from CSXT's rail cars and loading outbound automobiles onto automobile transport trailers operated by Common Carriers.

33. Through sublease agreements, CSXT and TDSI have subleased office space in buildings located on the Property to Common Carriers, namely Leaseway Motorcar Transport Company, UPS Supply Chain Solutions, Inc., Fleet–Car Lease, Inc., Supreme Auto Transport,

Inc., Brothers Auto Transport, LLC and United Road Services, Inc.

Reproduced Record (R.R.) at 578a–580a. The parties refer to the 7.883 acre portion of the Property used to move automobiles to their assigned parking spaces, and which provides the automobile transport trailers access to the automobiles as the "thermometer."

On or about July 30, 2010, CSXT filed a property tax assessment appeal with the Board seeking a real estate tax exemption for the Property. On November 15, 2010, the Board denied CSXT's appeal. On December 6, 2010, CSXT appealed from the Board's decision to the trial court. Both the School District and Upper Chichester Township intervened in the matter. On December 10, 2013, the trial court issued its Decision (Decision) and on December 30, 2013, its Order, holding that: "The Property, identified by [Folio 10], is subject to local taxation with the following PURTA exemptions: [(a)] 8.62 acres which is occupied by tracks, railroad beds and land beneath the tracks and railroad beds, and [(b)] 7.883 acres commonly referred to as 'the thermometer.'" Trial Ct. Decision at 11. On March 21, 2014, the trial court issued its Opinion (Opinion).

Despite specifically declaring in its Decision that the 8.62 acres from "[t]he Property, identified by [Folio 10]" was tax exempt (Trial Ct. Decision at 11, emphasis added), the trial court's Order stated contradictorily that "the 8.62 acres, occupied by tracks, railroad beds and land beneath the tracks and railroad beds which has been designated as [Folio 50], is not the subject of this appeal and remains exempt by virtue of the [Order which approved a stipulation resolving a 1999 lawsuit and exempted from taxation the area occupied by the tracks]." Trial Ct. Order

at 1 (emphasis added). The trial court further held "[t]hat the Folio No. which is the subject of this tax appeal is 09–00–01050–10 and said Folio No. 10 consists of 72.63 acres.... That of the 72.63 acres, the 7.883 acres which are referred to as 'the thermometer', shall be exempt from local real estate taxation and PURTA taxes...." *Id.* The trial court explained in its Decision:

> At trial, the parties disputed the amount of acreage at issue.... [CSXT] contends that 90.2 acres are in dispute; while the School District contends 72.63 acres are in dispute.... Having reviewed the Joint Exhibits, including but not limited to the reports of John J. Coyle, 3rd, MAI, CRE, and argument of counsel for Chichester School District this Court determines that 72.63 acres as appraised by Mr. Coyle was the appropriate acreage for review.

Trial Ct. Decision at 6.

■ Of the total 72.63 acreage, the trial court held that for the years 2011, 2012 and 2013, the value of the exempted 7.883 acres referred to as the "thermometer" was $1,234,106.00. Applying the applicable common level ratios to which the parties stipulated, the trial court determined that the assessed value of the exempted 7.883 acres for 2011 was $792,296.00, for 2012 was $833,885.00, and for 2013 was $888,556.00. The trial court also concluded that the value of the remaining taxable 64.747 acres for 2011, 2012 and 2013 was $10,565,894.00. The trial court determined, after applying the stipulated common level ratios, that the assessed value of the taxable portion of the Property was $6,783,304.00 for 2011, $7,139,375.00 for 2012 and $7,607,444.00 for 2013. Both CSXT and the School District appealed from the trial court's Order.[3]

---

3. "The scope of review in a tax assessment    appeal is restricted to a determination of

CSXT first argues that the entire Property is exempt from local real estate taxation solely under Article VIII, Section 4 of the Pennsylvania Constitution because it is "used or useful" in furnishing its public utility service. Pa. Const. art. VIII, § 4. Article VIII, Section 4 was an amendment to the Pennsylvania Constitution resulting from the 1968 Constitutional Convention (Amendment). That Amendment states:

The real property of public utilities is subject to real estate taxes imposed by local taxing authorities. **Payment to the Commonwealth of gross receipts taxes or other special taxes** in replacement of gross receipts taxes by a public utility **and the distribution by the Commonwealth to the local taxing authorities of the amount as herein provided shall,** however, **be in lieu of local taxes upon its real property which is used or useful in furnishing its public utility service.** The amount raised annually by such gross receipts or other special taxes shall not be less than the gross amount of real estate taxes which the local taxing authorities could have imposed upon such real property but for the exemption herein provided. This gross amount shall be determined in the manner provided by law. An amount equivalent to such real estate taxes shall be distributed annually among all local taxing authorities in the proportion which the total tax receipts of each local taxing authority bear to the total tax receipts of all local taxing authorities, or in such other equitable proportions as may be provided by law.

**Notwithstanding the provisions of this section, any law which presently subjects real property of public utilities to local real estate taxation by local taxing authorities shall remain in full force and effect.**

Pa. Const. art. VIII, § 4 (emphasis added).

"From 1826 ... until 1968, when [A]rticle VIII, [S]ection 4 was added to the Pennsylvania Constitution, the imposition of local real estate taxes upon the property of public utilities **essential to the utilities' operation** was prohibited unless an act of the General Assembly permitted local taxation." *Am. Tel. & Tel. Co. v. Bd. of Prop. Assessment, Appeals and Review of Allegheny Cnty.*, 461 Pa. 716, 337 A.2d 844, 846 (1975) (emphasis added; footnote omitted). Given the prohibition on local taxation of property "essential to the utilities' operation[s]," the Amendment made clear that existing laws subjecting public utility real property to taxation applied to the public utilities' real property that was not "essential to the utilities' operation." *Id.* Thus, because the Amendment retained existing tax liability, it is clear that the Amendment's use of the terms "used or useful" does not serve to impair or otherwise extinguish a public utility's real property's exposure to local taxation where that property is not essential to the utility's operation. The Amendment specifically preserved such tax laws. Thus, if the Property was not essential to CSXT's public utility operations, it would have been subject to local real estate taxation in 1968 and thus remains taxable. Accordingly, critical to our determination is whether the Property is "essential to the operation of" the railway.[4]

whether the trial court committed an error of law or abused its discretion." *In re Appeal of Jubilee Ministries Int'l*, 2 A.3d 706, 707 n. 5 (Pa.Cmwlth.2010).

4. The parties do not dispute that the 8.62 acres of the Property upon which the tracks are located are essential to the operation of the railway. Further, the trial court appears to have concluded that the 8.95 acre portion of the Property underlying Interstate 95 is also exempt from taxes because of its inability to be used. Neither party appears to challenge that conclusion. Although there is

Pennsylvania courts have long discussed the distinction between taxable and exempt public utility properties. In *Railroad v. Berks County*, 6 Pa. 70 (1847), our Supreme Court addressed the assessment of taxes on railroad property, stating:

[I]t is not enough that it is a convenient possession, or that it affords facilities in carrying on the business of the company. This valuable and extensive corporation, operating through a large extent of country, and doing an immense business at many points on the road, must necessarily employ many agents, as well as the occupation of houses and grounds to transact their legitimate business. It would no doubt be desirable and convenient to the company to own extensive warehouses, coal-yards, board-yards, coal[-]shutes, and extensive machine shops, at many points and places on the road. But these erections and conveniences form no part of the road. They are necessary and indispensable facilities to increase the business on the road, and to enable the company to make profits.... The judge was right in determining that 'the water stations and depots of the railroad were not taxable. **We understand depots so exempt from taxation, as the offices, the oil houses and places to hold cars, and such buildings and places as may fairly be deemed necessary and indispensable to the construction of the road. Warehouses, coal-lots, coal-shutes, machine shops, wood-yards, and such places, form no part of the construction of the road. They are only indispensable to the profits to be made by the company, and are legitimate subjects of taxation**.... They are not ap-

purtenant to the road, but to the business done upon it.

*Id.* at 75 (emphasis added). In *Cumberland Valley Railroad Company v. McLanahan*, 59 Pa. 23 (1868), our Supreme Court explained:

Whatever buildings and erections were necessary to the railroad as such—without which it would not be a complete and perfect railroad—fit for use—are included by implication. **Such would be depots for the reception and landing of passengers and freights, wood and water stations, toll-houses, watch-houses and others of similar character. But these words cannot be extended by any latitude of construction to comprehend a warehouse—a place for the storing and safe-keeping of goods—any more than it can be to the offices and residences of the officers and employees of the corporation.** This court has often had occasion to consider the question of what is to be regarded as forming a necessary part of a railroad—generally in cases in which claims have been made by the companies to hold their property exempt from county or municipal taxation. The cases are collected in the opinion of Judge Pearson, in *The Lackawanna Iron Co. v. Luzerne County*, 42 Pa. 424 [ (1862) ], and the result of them stated to be, that the line of road and ground occupied thereby, and the buildings immediately necessary for its enjoyment, not merely useful or convenient, are exempt; whilst all other property, though erected for the convenience of the company and to promote its trade and business, is subject to taxation. The opinion of the judge below in that case was adopted by the Supreme

---

some dispute about the actual size of Folios 50 and 10, and whether Folio 10 includes the portion of the Property upon which the tracks are located, neither party appears to contest that the parts of the property upon which the tracks are located, and under which Interstate 95 runs are not taxable.

Court. The principle of it has been reaffirmed in subsequent cases not yet reported, and may now be considered as firmly established.

*Id.* at 28 (emphasis added). In *County of Erie v. Erie and Western Transportation Company,* 87 Pa. 434 (1879), our Supreme Court held:

It has been repeatedly ruled that the property of canal and railroad companies, and other *quasi* public corporations, necessary for the exercise of their several franchises, as depots, toll-houses and water-stations, is not taxable for local purposes. The reason given for this exemption is that these things enter into the very composition of the works of these corporations, and, without which they could not exercise their corporate functions. On the other hand, it has been often and expressly held that such property as does not enter into the structure of a company's works, but is used only as a convenience for carrying on its business, is taxable. Warehouses, machine-shops and coal-shutes have been enumerated as property of this character[.]

We understand that the warehouses, the taxation of which is the subject of controversy, were used not only as storehouses, in the ordinary sense, but also for the transshipment of goods from vessels to railroads, and *vice versa,* from railroads to vessels. This being so, the case is met in point and ruled by *Wayne County v. The Delaware & Hudson Canal Co.,* 3 Harris 351[, 15 Pa. 351 (1850) ], wherein it was held, that build-ings situated at the junction of a canal and railroad, **used for receiving and transshipping goods and merchandise to and from the canal and railroad, to be forwarded along the lines of these works, must be regarded as warehouses and therefore taxable.**

*Id.* at 437–38 (citation omitted; emphasis added). In *City of Philadelphia to Use of Pugh v. Philadelphia & Reading Railroad Company,* 1 Pa.Super. 236 (1896), our Superior Court stated:

The principle of nonliability of specific property of a railroad company to ordinary taxation extends to the roadbed and such buildings and erections as are necessary to the railroad as such, without which it would not be a complete and perfect railroad. 'The rule which is to be extracted from the authorities on the subject of the liability of railroad companies to taxation for local purposes, is that it is **only so much of their property as is indispensable to the construction of the road and fitting it for use that is exempt.** It is not all which they can lawfully take or hold under their charters. It is not enough that it is a convenient possession affording facilities in conducting the business of the company and enabling it to make money.' [*E. Penn. R.R. Co's Appeal,* 1 Walk. 428 (Pa.1868), *overruled in part by, W. N.Y. & Pa. R. Co. v. Venango Cnty.,* 183 Pa. 618, 38 A. 1088 (1898).] This is substantially the rule laid down in [*Berks County* ]. There is often difficulty in determining between indispensability and great convenience, but the rule itself has been adhered to with as great consistency and strictness as is possible in the application of such a principle to the varying facts of the many cases that have arisen, and the distinctions have been steadily kept in view[.]

*Id.* at 245 (emphasis added). In *Western New York and Pennsylvania Railroad Company v. Venango County,* 183 Pa. 618, 38 A. 1088 (1898), our Supreme Court found that a railroad's machine shop used for the maintenance and repair of railroad equipment was "one of the necessities of the business of transporting passengers

and freight[,]" and thus, was not subject to taxation. *Id.* at 1089. In reaching that conclusion, the Court reviewed prior opinions, noting:

> Freight and passenger depots upon the line of a railroad were considered in *Northampton [County] v. Lehigh Coal [and Navigation Company]*, 75 Pa. 461 [(1874)]. It would be possible to discharge passengers and freight into the streets, and so dispense with such structures; yet we held that they were reasonably necessary to the business of the railroad company, and constituted a part of its corporate machinery properly employed by it as incident to its carrying trade. They were, therefore, not taxable by the local authorities. This rule was held in *[Cumberland Valley] Railroad Co. v. McLanahan*, 59 Pa. [23,] 29 [(1868)], to include all buildings required for and in use by the company in its ordinary operations, such as water stations, toll houses, watch houses, oil houses, and 'whatever buildings, without which the railroad would not be a complete and perfect railroad.'

*Venango County*, 38 A. at 1088. Thus, the Court concluded:

> [T]he distinction between construction and repair has been generally recognized. In *[Pennsylvania & N.Y. Canal & R.R.] Co. v. Vandyke*, [137 Pa. 249] 20 [A.] 653 [(1890)], the shops operated by the company were held liable to local taxation because they were maintained 'for the construction and repair of its locomotives and cars.' The fact that they were used for construction made them liable, notwithstanding repairs might also have been made at them. This distinction seems to us to rest on principle as well as on the authority of our own cases. The business a corporation may lawfully do must be defined by its charter. If it is to supply a munici-pality with water or gas, its implied or incidental powers must be such as are reasonably necessary to the proper performance of its functions as a water or a gas company. It cannot manufacture pipe, because it may need to use pipe in the distribution of water or of gas. It cannot engage in the manufacture of plumbers' supplies, because it might be profitable to be able to supply its customers with such goods. Its business is one,—the supply of water or gas, as it may be, to its customers,—and to this it must devote its attention and confine its operations. It is precisely the same with a railroad company. It is given great privileges and franchises to enable it to build and operate a line of railroad for the public convenience and its own private profit. It must devote itself to the business for which the state has created it and clothed it with its powers and privileges. It may not embark in the mining of coal without leave. It may not engage in the business of making and manufacturing iron and steel, or in the production of textile fabrics, or in the establishment of commercial houses, or any other business enterprise not incident to, and reasonably necessary for, the successful running of a railroad. It may improve its road to any extent that it is practicable to do. It may avail itself of the best-known equipments and adjuncts so long as they are equipments and adjuncts only, and make its road as nearly perfect as it may be able. It may provide the best-known machinery and the means for keeping it as nearly as possible in constant order and repair, but here is the exterior limit of its appropriate field of operations. It may buy the best rails and cars and engines the manufacturing establishments of the world can offer. It may operate them with the highest skill it can command. It may employ all necessary mechanical

talent to keep its road and its rolling stock in the best possible state of repair, and to offer the public the greatest efficiency and safety attainable in its business. This is the legitimate province of a railroad company, and within it is ample room for the employment of its capital, and for the exercise of the highest administrative powers within its reach. With this province it must be content. If it steps over its boundary, local taxation is among the penalties which it incurs, and which it ought to be ready to submit to without protest.

*Venango County,* 38 A. at 1089–90.

In *Delaware, Lackawanna & Western Railroad Company v. Metzgar,* 28 Pa.Super. 239 (1905), our Superior Court determined that property used by a railroad for the manufacturing of ice to be used in its railcars was not exempt from taxation. The Court stated:

Assuming, as contended for by the appellant, that ice is the great preservative of perishable freight, and that if such freight is to be preserved in transit, ice must be used for that purpose, it does not follow that a company chartered for the transportation of freight, is warranted in going into the business of manufacturing ice, either by adopting the natural ice formed on its lands and storing it in houses, or by the erection of an artificial ice manufactory, and may then claim exemption from liability to local taxation upon this collateral enterprise. Arguments of like relevancy could be urged with equal force in the case of restaurants along its line for the convenience of passengers; storage barns for hay and grain to be fed to stock in transit; or factories for making crates and boxes in which to transport more conveniently certain kinds of freight. The whole system is a matter of convenience and profitable management of the freight depart-

ment, rather than an indispensable method of transportation. The testimony of the superintendent of car service established beyond question that the ownership of the ice ponds and the maintenance of ice houses are matters of convenience at least, if not of independent profit to the company. The ice ponds and ice houses may be indispensable in the sense that it is necessary to use ice on perishable freight, in order that the company will secure its proportion of freight from the general public and conduct the business of the corporation at a profit, but these ponds and houses are not indispensable as the sole source of supply of ice nor in the sense that they are necessary to the operation of the railroad as such.

*Id.* at 243.

Historically, a railroad right-of-way was considered exempt from taxes and had been equated to a railway roadbed. *See, e.g., Allegheny City v. West. Pa. R.R. Co.,* 138 Pa. 375, 21 A. 763 (1891); *Borough of Mt. Pleasant v. Baltimore & Ohio R.R. Co.,* 138 Pa. 365, 20 A. 1052 (1891); *see also City of Phila. v. North Pa. R.R. Co.,* 1 Pa.Super. 254 (1896). In *Borough of Mt. Pleasant,* our Supreme Court explained that "a municipal claim for paving cannot be filed against the road[ ]bed, or **that narrow strip of ground** which forms the right[-]of[-]way of a railroad." *Id.* at 1052 (bold and underline emphasis added). The Court concluded that "while the road[ ]bed or right[-]of[-]way of a railroad company is not the subject of a claim for paving, it does not follow that a passenger or freight depot, the ground belonging to the company, and used as a lumber yard or other purpose, may not be subjected to such a charge." *Id.* at 1053. In distinguishing between the railroad's right-of-way and its depots, and other grounds, it is clear that the Court did not include the

other grounds in its understanding of the right-of-way as a "narrow strip of ground[.]" *Id.* at 1052. *See also City of Phila. v. North Pa. R.R. Co.; S. Fork Borough v. Pa. R.R. Co.,* 251 Pa. 261, 96 A. 710, 711 (1916) (distinguishing between the exempted "roadbed and right[-]of[-]way of the railroad" and "the stations, platforms and other property of the railroad, not absolutely necessary to the exercise of the franchises of the corporation"); *see also Use of Pugh,* 1 Pa.Super. at 253 ("There is a manifest difference between the roadbed—that narrow strip of ground which forms the right[-]of[-]way of a railroad—and a lot of land owned in fee and traversed by the tracks of a railroad company, but part of which lot is . . . but a convenient possession, affording facilities in conducting the business of the company and enabling it to make money" (quotation marks omitted)).[5]

Based upon the above-cited case law and the narrow application of tax exemptions to **only** those essential, indispensable parts necessary to operate the railroad, we conclude that the 72.63 acres which includes the "thermometer" used to move the vehicles to and from their temporary storage locations and provide the automobile transport trailers access to the automobiles, is not part of CSXT's railroad right-of-way. Rather, it serves a function akin to a warehouse "in carrying on the business of the company . . . only indispensable to the profits to be made by the company, and are legitimate subjects of taxation. . . . They are not appurtenant to the road, but to the business done upon it."[6] *Berks County,* 6 Pa. at 75. The area "used for receiving and transshipping goods and merchandise to and from . . . the railroad, to be forwarded along the lines of these works, must be regarded as warehouses and therefore taxable." *County of Erie,*

---

5. *See Borough of Aliquippa v. Pittsburgh & Lake Erie R.R. Co.,* 94 Pa.Super. 279, 288 (1928) ("A railroad company is authorized to condemn by appropriate proceedings for roadbed a strip of land of the width authorized by statute; and it may, in addition, acquire land for sidings and turnouts for the speedy and safe passage of its cars; land so acquired would properly be termed roadbed, and be exempt from taxation[.]") In *Aliquippa,* although a slope adjacent to the track was deemed necessary to the stability of the track and was exempt from a municipal claim for paving, the railroad admitted that the station house portion of the subject property was subject to assessment. The Court determined that the lower court had properly found the exemption did "not extend to station houses, platforms and other property of the railroad, not absolutely necessary to the exercise of the franchise of the corporation." *Id.* at 286.

6. The trial court held that:

[t]he 7.883 acres referred to as 'the thermometer' is used or useful as a railroad right-of[-]way in furnishing a public utility service at this particular site. In the instant matter, the automobiles are unloaded by

third[-]party contractors from CSXT's trains and the unloaded automobiles are moved to assigned parking bays or spaces on the Property exclusively utilizing the 7.883 acres of the thermometer. The design and placement of the thermometer are specific to the necessary and indispensable services provided by CSXT at this particular depot. Given the unique layout exclusive to this site, the 7.883 acres of the thermometer should be considered a 'right-of-way' providing a necessary and indispensable service.

Trial Ct. Opinion at 10–11. "The thermometer" is not a right-of-way similar to those described in the aforementioned case law. The "thermometer" is a part of the 72.63 acres, located fully therein, and used to move the vehicles to and from their temporary storage locations. If, as we have found, the 72.63 acres is "only indispensable to the profits to be made by [CSXT,]" then the "thermometer," used in the operation of the 72.63 acres, is similarly indispensable to CSXT's profits. *Berks Cnty.,* 6 Pa. at 75. Accordingly, the "thermometer" would also have been subject to local real estate taxation by local taxing authorities at the time the Amendment became effective.

87 Pa. at 437.[7] Thus, consistent with case law, the 72.63 acres was subject to local real estate taxation at the time that the Amendment became effective.

■ CSXT also argues that the Property is "utility realty" under PURTA, and as such, is not locally taxable. CSXT contends that as "utility realty," the entire Property constitutes a railroad "right-of-way" and, less the buildings and property appurtenant thereto, is thus expressly exempted from PURTA taxation. The School District disputes CSXT's assertion, arguing that the Property cannot be "utility realty" as defined in PURTA, and thus is locally taxable because the Property was "subject to local real estate taxation" under case law in effect on April 23, 1968. It

asserts that the Property is taxable because it does not qualify as a "right-of-way," since it is used in a manner akin to a warehouse, a use which was historically subject to taxation, and is explicitly excluded from the "right-of-way" PURTA tax exemption. We agree.

PURTA establishes four requirements in order for real property to be considered "utility realty" under the statute. The property is: (1) located in Pennsylvania; (2) owned by a public utility or its affiliate either directly or by or through a subsidiary; (3) used, in whole or in part, in the furnishing of public utility service; and, (4) the property is not subject to local real estate taxation under any law in effect on April 23, 1968.[8]

7. The Concurring and Dissenting Opinion posits that "[b]ecause freight (automobiles) are received in the 'thermometer,' but not stored in the area, I find no fault in the trial court's determination that this area was a nontaxable 'depot.'" Concurring and Dissenting op. at 626. However, "[t]here is often difficulty in determining between indispensability and great convenience, but the rule itself has been adhered to with as great consistency and strictness as is possible in the application of such a principle to the varying facts of the many cases that have arisen, and the distinctions have been steadily kept in view[.]" *Use of Pugh*, 1 Pa.Super. at 245–46. The Pennsylvania Supreme Court in *Berks County* and *McLanahan*, discussed the fine distinctions between warehouses and property essential to a utility's operation. Further, our Supreme Court held in *County of Erie*, where "the warehouses ... were used not only as storehouses, in the ordinary sense, but also for the transshipment of goods from vessels to railroads, and vice versa, from railroads to vessels[,]" such warehouses were taxable. *Id.* at 437. Here, in addition to serving as a place to remove the automobiles from the railcars and load the common carriers, the thermometer is also used to move the automobiles to their assigned "warehouse" location. Like a warehouse that has aisles to access stored inventory, the thermometer is like an aisle that provides access to the stored vehicles. Thus, although the

thermometer may serve multiple functions including transshipping, because it serves in the operation of the warehouse, it is subject to local taxation.

8. PURTA Section 1101–A(3), 72 P.S. § 8101–A(3), defines "[u]tility realty" as:

All lands, together with all buildings, towers, smokestacks, dams, dikes, canals, cooling towers, storage tanks, reactor structures, pump houses, supporting foundations, enclosing structures, supporting structures, containment structures, reactor containment outer shells, reactor containment vessels, turbine buildings, recovery tanks, solid waste area enclosures, primary auxiliary buildings, containment auxiliary safeguard structures, fuel buildings, decontamination buildings, and, all other structures and enclosures whatsoever which are physically affixed to the land, no matter how such structures and enclosures are designated and without regard to the classification thereof for local real estate taxation purposes ... that at the end of the taxable year are **owned by a public utility or its affiliate either directly or by or through a subsidiary and are used or in the course of development or construction for use, in whole or in part, in the furnishing, including producing, storing, distributing or transporting, of public utility service and which are not subject to local**

Generally, those items that are "utility realty" are subject to PURTA taxation. We have already concluded that the entire 72.63 acres was "subject to local real estate taxation under . . . law in effect on April 23, 1968," and thus, it cannot be considered "utility realty" under PURTA. 72 P.S. § 8101–A(3). However, even if we had concluded otherwise, the 72.63 acres would **not** be exempt from PURTA taxation. PURTA exempts from PURTA taxation "[r]ailroad beds or rails, land owned or used by a railroad as a right-of-way for a rail line and superstructures thereon." 72 P.S. § 8101–A(3)(ii). However, PURTA **specifically excludes** from that exemption "stations, **buildings, warehouses,** shops, engine houses, plants or miscellaneous structures or the land appurtenant thereto." [9] *Id.* (emphasis added).

CSXT attempts to come within PURTA and PURTA's tax exemption by claiming that the entirety of the Property constitutes a railroad right-of-way because it is "used 'in whole **or part'** in the furnishing of a public utility service." CSXT's Br. at 25 (quoting 72 P.S. § 8101–A(3)) (emphasis added). It contends that "[a]s a transloading facility that is indispensable to CSXT's operation as a public utility, the entire 90.2[-]acre Property is owned or used as a railroad right-of-way." CSXT's Br. at 28. It further argues that because the Property constitutes a right-of-way, only the four buildings and the land appurtenant thereto are subject to PURTA taxation. As previ-

ously discussed, based upon the historical interpretation of the term right-of-way in the railway context, we conclude that the 72.63 acres was not a part of CSXT's right-of-way, but rather akin to a warehouse. Thus, even if it were "utility realty" under PURTA, it would not be exempt from PURTA taxation.

■ CSXT also argues that because "part" of the Property is "used . . . in the furnishing of a public utility service[,]" the entire Property (but for the four buildings and the land appurtenant thereto) is exempt from taxation. CSXT's Br. at 25. Thus, it contends that the trial court erred when it "relied on conclusions of Chichester's appraiser [where he] appraised the Property as subject to taxation minus certain areas that include railroad tracks[,]" since the entire Property should have been found to be exempt. CSXT's Br. at 30. Contrary to CSXT's interpretation of the PURTA language, we interpret the "in whole or part" language not to refer to portions of a property, but instead, to the nature of the use of that property. This construction is consistent with the historical doctrine that "it is only so much of [a railroad's] property as is indispensable to the construction of the road and fitting it for use that is exempt [from local taxation]. It is not all which they can lawfully take or hold under their charters." *Use of Pugh,* 1 Pa.Super. at 245. Thus, we reject CSXT's assertion that the trial court erred.

---

real estate taxation under any law in effect on April 23, 1968: Provided, however, That the following specified items shall be exempt from the tax hereby imposed:
  (i) Easements or similar interests.
  (ii) **Railroad beds or rails, land owned or used by a railroad as a right-of-way for a rail line and superstructures thereon.** *This subclause does not include stations, buildings, warehouses, shops, engine houses, plants or miscellaneous structures or the land appurtenant thereto.*

  (iii) Pole, transmission tower, pipe, rail or other lines whether or not said lines are attached to the land or to any structure or enclosure which is physically affixed to the land.
(Emphasis added).

9. Based upon the enumerated exclusions to the PURTA exemptions, CSXT concedes that the buildings and property appurtenant thereto are not exempt from PURTA tax. CSXT's Br. at 27.

Based upon the aforementioned discussion, we disagree with CSXT's contention that "the four buildings and the land appurtenant thereto have a PURTA taxable market value of $800,000[.00]" and that "the entire property is utility realty, and thus it is exempt from local taxation [and] [f]urthermore, since the entire property is owned or used as a railroad right-of-way only the buildings and land appurtenant to the buildings are subject to PURTA tax." CSXT's Br. at 29, 30.

CSXT further maintains that

the trial court erred in holding that Folio 10 has a taxable fair market value of $10,565,894[.00].... In so holding, the trial court relied on conclusions of [the School District's] appraiser. [The School District's] appraiser did not appraise the buildings and land appurtenant to the buildings; rather, he appraised the Property minus certain areas that include railroad tracks.... Therefore, the trial court erred in adopting an appraisal valuing anything beyond the buildings and land appurtenant to those buildings.

CSXT's Br. at 30–31. Having already determined that the 72.63 acres is subject to local taxation, we find CSXT's argument without merit.

■ Finally, we conclude that the trial court properly determined that the Property consists of 72.63 acres. CSXT challenges the evidence supporting the trial court's finding, arguing that Folio 10 and Folio 50 do not indicate specific acreage. However, it was undisputed that, of the Property's total 90.2 acres, 8.95 acres were under Interstate 95 and exempt. As to the area under the tracks represented by Folio 50, CSXT's own expert report found the area totaled 8.49 acres. See R.R. at 104a. The School District's expert report found the same exempt Folio 50 area to be 8.62 acres, **an area even larger than CSXT's expert's findings**. The trial court then subtracted the exempted areas—8.95 acres plus 8.62 acres—from the total 90.2 Property acreage. We do not find that the trial court erred when it relied upon the School District's expert in assigning 8.62 acres to the Folio 50 area and the undisputed 8.95 acres under Interstate 95 to conclude that 72.63 acres were at issue.

For all of the above reasons, we affirm the trial court's holding that the 72.63 acres are subject to local real estate taxation, reverse the portion of the trial court's decision finding that "the thermometer" area is not subject to such taxation, and conclude that the entire 72.63 acres are subject to local real estate taxation.

## ORDER

AND NOW, this 19th day of November, 2014, the Delaware County Common Pleas Court's (trial court) December 30, 2013 order is affirmed to the extent it found CSX Transportation, Inc., its Affiliates and Subsidiaries' (CSXT) 72.63 acre property is subject to local real estate taxes. The trial court's determination that the 7.883 acres referred to as the "thermometer" portion of the property is exempt from local taxation is reversed.

It is hereby Ordered that CSXT's entire 72.63 acres are subject to local taxation.

CONCURRING AND DISSENTING
OPINION BY Judge SIMPSON.

I concur to the extent the Majority affirms the trial court. I respectfully dissent to that small portion of the Majority opinion which reverses the trial court's determination regarding a 7.883 acre parcel referred to as the "thermometer." Majority Op., at 622 n. 6. The trial court determined that this parcel was exempt from real property taxes. I would affirm this determination as well as the other

determinations made by the respected trial court.

With regard to the "thermometer," the trial court determined the 7.883 acre parcel is used or useful in furnishing a public utility service. Tr. Ct., Slip. Op., 3/21/14, at 10. The parties agreed that the acreage colored in orange on Joint Exhibit 41 contains 7.883 acres. Second Stip. of Facts, 10/7/13; Joint Ex. No. 41; Reproduced Record at 685a–687a. The trial court identified certain improvements located on or related to the thermometer, including site clearing, site cutting, site filling and paving. Tr. Ct. Order, 12/30/13, at ¶ 8.

According to the taxpayer, CSX Transportation Inc., the thermometer is used to unload automobiles from its trains and move them to parking bays on the property. Importantly, no vehicles are stored in this area. The taxing authority school district describes the thermometer as "an interior drive used for the purpose of access to an area where automobiles are parked and stored and for the loading of the automobiles onto common carriers." Designated Appellee's Br. at 47.

The cases differentiate between nontaxable "depots for the reception and landing of passengers and freights," and a taxable "warehouse—a place for the storing and safe-keeping of goods...." *Cumberland Valley R.R. Co. v. McLanahan,* 59 Pa. 23, 29 (1868). Based on the unique layout exclusive to this site, the trial court specifically determined the "thermometer" was a

"depot," not a warehouse. Tr. Ct., Slip Op., 3/21/14, at 10.

Because freight (automobiles) are received in the "thermometer," but not stored in the area, I find no fault in the trial court's determination that this area was a nontaxable "depot." The trial court was certainly within its discretion in determining this small portion of the property is not only used and useful, but necessary and indispensable in providing a public utility service.

Moreover, the cases relied upon by the Majority do not compel a different conclusion. *See* Majority Op., at 623 n. 7. In particular, in *The County of Erie v. The Erie and Western Transportation Company,* 87 Pa. 434 (1879), and in a case cited therein, *Commissioners of Wayne County v. Delaware & Hudson Canal Company,* 15 Pa. 351 (1850), the Supreme Court relevantly addressed the taxability of *buildings.* In both cases the Court determined the buildings were taxable warehouses. In contrast, the "thermometer" area is not a building. It does not have walls and a roof. Freight is received, but not stored there. Therefore, I cannot consider it a warehouse.[1]

For the reasons stated in the thoughtful opinion of the Honorable G. Michael Green, I would affirm on this issue as well as the other issues raised in this appeal.

---

1. It is abundantly clear that the trial court perceived the dispositive focus on limiting any tax exemption to property "absolutely necessary to the exercise of the franchise of the corporation." *Borough of Aliquippa v. Pittsburgh Lake Erie R.R. Co.,* 94 Pa.Super. 279, 288 (1928) (cited by trial court: *see* Tr. Ct., Slip Op., 12/10/13, Conclusion of Law No. 8; Trial Ct., Slip Op., 3/21/14, at 10). In fact, the trial court carefully crafted its findings to

determine that the "thermometer" area constituted a "depot." Tr. Ct., Slip Op., 3/21/14, at 10.

Further, as discussed above, the trial court resolved the issue of the "thermometer" not as a matter of law, but as a matter of fact, because "the unique layout exclusive to this site" was "specific to the necessary and indispensable services provided by [taxpayer] at this particular depot." *Id.*