IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Lehigh Valley Rail Management LLC,  :
                Appellant  :
  :
         v.  :  No 288 C.D. 2015
  :  Argued: September 14, 2015
County of Northampton Revenue  :
Appeals Board and County of  :
Northampton  :


BEFORE:   HONORABLE BONNIE BRIGANCE LEADBETTER, Judge
              HONORABLE MARY HANNAH LEAVITT, Judge
              HONORABLE JAMES GARDNER COLINS, Senior Judge

OPINION
BY JUDGE LEAVITT                        FILED: November 10, 2015


Lehigh Valley Rail Management LLC (Railroad) appeals an order of the Northampton County Court of Common Pleas (trial court) regarding the taxation of its 107.93-acre parcel of land. The Northampton County Revenue Appeals Board (Board) held that the entire parcel was utility realty as defined in the Public Utility Realty Tax Act, 72 P.S. §§ 8101-A – 8112-A (PURTA),[1] meaning that it was exempt from local real estate tax but could be subject to a statewide tax under PURTA. The trial court affirmed the Board's decision with respect to 22.92 acres, but it reversed the Board with respect to the remaining 85.01 acres, holding that it was not utility realty. Accordingly, the trial court's order subjected the 85.01 acres to taxation by local taxing authorities.

---

[1] Article XI-A of the Tax Reform Code of 1971, Act of March 4, 1971, P.L. 6, *as amended*, added by Section 3 of Act of July 4, 1979, P.L. 60, *as amended,* 72 P.S. §§ 8101-A - 8112-A.

## Background

Railroad is a Pennsylvania public utility. On November 29, 2012, it purchased the 107.93-acre parcel at issue (Property) in the City of Bethlehem, which is dedicated to Railroad's "intermodal railroad terminal." Of the 107.93 acres, 22.92 acres consists of railroad beds with tracks; the other 85.01 acres do not have railroad tracks. The Property has been used as an intermodal transfer terminal for over 10 years.

An intermodal railroad terminal works in the following manner. Freight arrives at the facility in sealed rail-ready containers by train or tractor trailer.[2] The containers are transferred from train to tractor trailer or vice-versa without being opened. The transfers take place in "aisles" between the railroad tracks. Daily and continuously, machines known as "packers" move through the aisles to transfer the sealed containers to and from rail cars. The packers lift each container from the rail car and ground it for pick up and attachment to a truck, which takes the untouched cargo container to its next destination. The aisles are specifically sized and designed for packers. Without these defined aisles and the adjacent areas where containers are staged, there would be no means by which to transfer the containers to or from the trains.

In addition to the packer aisles, a portion of the Property is used for storing containers until they are transferred. These storage areas ring the railroad beds, *i.e.*, the 22.92 acres that was held to be utility realty. Storage is necessary because it is impossible to transfer each container immediately upon arrival. However, containers remain on the Property for no more than 24 hours.

---

[2] According to the briefs, both the trains and the tractor trailers that use the intermodal railroad terminal are common carriers regulated by the Public Utility Commission.

The remainder of the Property is used in different ways. There are steep embankments and a detention pond, which are needed for stormwater management. In addition, the embankments provide a level grade for the railroad beds. The Property includes a mobile office trailer and a parking lot for office staff and visitors.

On June 26, 2013, the Northampton County Assessment Office (Assessment Office) issued a "Notice of Change" to Railroad asserting, for the first time, that part of the Property was subject to local real estate taxes, and the remainder was taxable by the Commonwealth as utility realty pursuant to Section 1102-A(a) of PURTA. Railroad appealed the Assessment Office's determination to the Board.

A hearing was held on December 2, 2013. On December 5, 2013, the Board held that the entire Property was utility realty and, as such, exempt from local taxation. Nevertheless, utility realty is subject to the statewide PURTA tax unless there is an applicable statutory exemption. Railbeds and rail right-of-ways are examples of utility realty exempt from the PURTA tax. The Board referred the question of Railroad's eligibility for an exemption to the Assessment Office. The Assessment Office decided that the 85.01 acres of the Property lacking railroad tracks, assessed at $1,275,200, was subject to the PURTA tax. It held that the 22.92 acres with railroad tracks, assessed at $343,900, was exempt under PURTA.

Railroad appealed to the trial court. The parties submitted a stipulation of facts to the trial court. On September 22, 2014, the trial court judge and the parties did an on-site inspection of the Property. The parties submitted briefs, and the trial court heard oral argument. Thereafter, upon learning of this Court's decision in *CSX Transportation, Inc. v. Delaware County Board of*

3

*Assessment Appeals* (*CSX*), 104 A.3d 612 (Pa. Cmwlth. 2014), the trial court directed the parties to submit additional briefs. Railroad requested the opportunity to present evidence on the differences between its intermodal railroad terminal and the railroad property at issue in *CSX*. The trial court granted Railroad's request, and the hearing was held on January 29, 2015.

At the hearing, Railroad presented the testimony of one of its owners, Patrick Sabatino. Counsel for Railroad questioned Sabatino regarding Railroad's intermodal operations:

> Q. Freight cars are, however, moved from motor vehicles onto rail cars?
>
> A. Containers and trailers are moved from the rail cars to chassis, or if they have – they're on wheels already to the ground.
>
> Q. Do you unload any freight or cargo within those container cars?
>
> A. No, we don't touch any of the cargo. They're sealed. When they're loaded at the origin or they're sealed when we load a container in our yard to go out, they're sealed. We never touch any of the inside [of] the containers [or] trailers.
>
> Q. Is there any sorting or assembly procedures that occur at your intermodal unit?
>
> A. No.

Reproduced Record at 323a (R.R.__). Counsel for Railroad further questioned Sabatino concerning the extent of Railroad's interaction with the freight:

> Q. Is there any instance on your property that the doors would be unsealed, opened, and freight either whole carloads or individual items taken out?

4

A. No. If there's a seal broken, we have to -- security opens it, checks to make sure nothing was touched, and then reseals it. That's the only time -- if there's a seal off, there's a problem.

R.R. 342a.

The trial court questioned Sabatino as follows about Railroad's handling of inbound and outbound freight:

Q. Do you store or hold the containers on the property for any length of time?

A. No. That's the whole idea behind intermodal. It's to get it across the country to the warehouse in the shortest amount of time.

* * *

Q. What's the longest length of time that a container would be held, staged, [or] stored, on the intermodal property? What's the longest length of time?

A. I don't have that information. But I can tell you the turn and churn is pretty good. I would say 24 hours, because if it's not going out in tonight's train it's going out on tomorrow's train.

***

Q. [Y]ou're saying [the containers] would in all likelihood not be there longer than 24 hours until the truck could come get them?

A. That's correct. Or if they came in -- you have to remember we ship containers out also. So you know, that's one of the cases of trying to mix the inbound with the outbound.

R.R. 331a-34a.

On February 12, 2015, the trial court issued a ruling that the 85.01-acre portion of the Property lacking railroad tracks did not constitute utility realty.

5

The trial court reasoned that the 85.01 acres were "used for purposes similar to those in the [*CSX*] case, which the Commonwealth Court rejected as utility realty and deemed more akin to a warehouse." Trial court op. at 23. However, the trial court did not disturb the Board's conclusion that the 22.92 acres with the railroad beds were utility realty. Because the 85.01 acres were not utility realty, the trial court held that this portion of the Property was subject to local real estate tax. The remaining 22.92 acres were exempt from taxation, even the PURTA tax. Railroad appealed to this Court.

On appeal,[3] Railroad makes two arguments. First, Railroad contends that the trial court erred in relying on *CSX* because that case is distinguishable on its facts. Second, Railroad argues that with a small exception for the office and parking area, all of the Property is utility realty and, further, exempt from the PURTA tax. In response, the Board asserts that the trial court did not err, and, in the alternative, that even if the 85.01 acres are utility realty, they are subject to the PURTA tax because they do not fall within the statutory exemption from taxation.

### Utility Realty Taxation

Historically, real estate owned by public utilities was not subject to local taxation. As our Supreme Court has explained:

> From 1826, when [the Pennsylvania Supreme] Court decided *Schuylkill Bridge Co. v. Frailey*, 13 S. & R. 422 (Pa. 1826), until 1968 when article VIII, section 4 was added to the Pennsylvania Constitution, *the imposition of local real estate taxes upon the property of public utilities essential to the utilities' operation was prohibited*.

---

[3] When considering a tax assessment appeal, this Court's review determines whether the trial court committed an error of law or abused its discretion. *In re Appeal of Jubilee Ministries International*, 2 A.3d 706, 707 n.5 (Pa. Cmwlth. 2010).

6

*American Telephone and Telegraph Co. v. Board of Property Assessment, Appeals and Review of Allegheny County*, 337 A.2d 844, 846 (Pa. 1975) (emphasis added). The 1968 adoption of Article VIII, Section 4 effected a significant change. It states:

> The real property of public utilities is subject to real estate taxes imposed by local taxing authorities. *Payment to the Commonwealth of gross receipts taxes or other special taxes in replacement of gross receipts taxes by a public utility and the distribution by the Commonwealth to the local taxing authorities of the amount as herein provided shall, however, be in lieu of local taxes upon its real property which is used or useful in furnishing its public utility service.* The amount raised annually by such gross receipts or other special taxes shall not be less than the gross amount of real estate taxes which the local taxing authorities could have imposed upon such real property but for the exemption herein provided. This gross amount shall be determined in the manner provided by law. *An amount equivalent to such real estate taxes shall be distributed annually among all local taxing authorities in the proportion which the total tax receipts of each local taxing authority bear to the total tax receipts of all local taxing authorities*, or in such other equitable proportions as may be provided by law. Notwithstanding the provisions of this section, any law which presently subjects real property of public utilities to local real estate taxation by local taxing authorities shall remain in full force and effect.

PA. CONST. art. VIII, §4 (emphasis added). Article VIII, Section 4 made utility realty subject to local taxation. However, it created a "gross receipts" or "other special" tax to function "in lieu of local taxes" that was to be collected and distributed by the Commonwealth.

To effect Article VIII, Section 4, the General Assembly enacted PURTA, which "imposed a state-wide property tax upon the 'depreciated value' of

7

the real estate of public utilities." *American Telephone*, 337 A.2d at 848. PURTA pursued the "special tax" option in Article VIII, Section 4 for the taxation of utility realty, as opposed to a "gross receipts" tax. Section 1102-A(a) of PURTA authorizes taxation on the "value of utility realty" in Pennsylvania. 72 P.S. §8102-A(a). However, where a public utility's real estate is not used to furnish public utility service, it is not "utility realty" and can be taxed by local taxing authorities. Section 1104-A(a) of PURTA, 72 P.S. §8104-A(a).

Section 1101-A(3) of PURTA defines utility realty as:

*All lands*, together with all buildings, towers, smokestacks, dams, dikes, canals, cooling towers, storage tanks, reactor structures, pump houses, supporting foundations, enclosing structures, supporting structures, containment structures, reactor containment outer shells, reactor containment vessels, turbine buildings, recovery tanks, solid waste area enclosures, primary auxiliary buildings, containment auxiliary safeguard structures, fuel buildings, decontamination buildings, and, all other structures and enclosures whatsoever which are physically affixed to the land, no matter how such structures and enclosures are designated and without regard to the classification thereof for local real estate taxation purposes, but not including machinery and equipment, whether or not housed within such building, structure or enclosure, or, after December 31, 1999, land and improvements to land that are indispensable to the generation of electricity, *located within this Commonwealth* that at the end of the taxable year are *owned by a public utility* or its affiliate either directly or by or through a subsidiary and are *used* or in the course of development or construction for use, in whole or in part, *in the furnishing, including producing, storing, distributing or transporting, of public utility service and which are not subject to local real estate taxation under any law in effect on April 23, 1968*: Provided, however, that the following specified items shall be exempt from the tax hereby imposed:

    (i)   Easements or similar interests.

8

> (ii) *Railroad beds or rails, land owned or used by a railroad as a right-of-way for a rail line and superstructures thereon. This subclause does not include stations, buildings, warehouses, shops, engine houses, plants or miscellaneous structures or the land appurtenant thereto.*
>
> (iii) Pole, transmission tower, pipe, rail or other lines whether or not said lines are attached to the land or to any structure or enclosure which is physically affixed to the land.

72 P.S. §8101-A(3) (emphasis added). In sum, four elements must be met in order for real property to be considered "utility realty." The property must (1) be located in Pennsylvania; (2) owned by a public utility; (3) used to furnish public utility service; and (4) not be subject to local real estate taxation under any law in effect on April 23, 1968. *Id*. Here, the element in contention is whether Railroad's Property was subject to local real estate taxation prior to 1968.

Prior to 1968, the standard for determining whether realty owned by a public utility was taxable was as follows:

> It is only such property belonging to a railroad corporation as is appurtenant and indispensable to the construction and preparation of the road for use that can claim to be exempt from taxation; such property as is only indispensable to the making of profits being liable to taxation.

*Railroad v. Berks County*, 6 Pa. 70, 70 (Pa. 1847). Stated otherwise, realty "indispensable" to the public utility's operations was exempt from taxation. On the other hand, realty that advanced a utility's ability to make a profit, but was not essential to providing the utility service, was taxable. Our Supreme Court offered the following examples of property that could and could not escape local taxation:

9

> *[W]ater stations and depots*--by which latter is to be understood, the offices, oil houses, and places to hold cars, and *such places and buildings as may fairly be deemed necessary and indispensable to the construction of the road--are not taxable*; whilst warehouses, coal-lots, coal-shutes, machine-shops, wood-yards, and the like, are taxable.

*Id*. (emphasis added).

*CSX* is instructive on the scope and meaning of Article VIII, Section 4 and the terms of PURTA. At issue in *CSX* was a 72.63-acre parcel of land in Delaware County owned by CSX Transportation, a railroad. CSX used a rail line to transport automobiles to the property, where they were unloaded and placed into a large parking lot. Common carriers loaded the vehicles onto car trailers for delivery to car dealers in the Philadelphia and New Jersey area. The average turnover time from "the unloading of an automobile from a rail car [to] its departure from the [p]roperty via the Common Carriers [was] about 24 to 48 hours." *CSX*, 104 A.3d at 615. CSX claimed that under Article VIII, Section 4 of the Pennsylvania Constitution the entire property was utility realty because it was all "used" or was "useful" to "furnishing its public utility service." PA. CONST. art. VIII, §4.

CSX advanced a separate argument for 7.883 acres known as the "thermometer," which was "used to move automobiles to their assigned parking spaces, and which provides the automobile transport trailers access to the automobiles ...." *CSX*, 104 A.3d at 615. CSX argued that the thermometer was a "depot," which historically had been considered utility realty.[4] This Court

---

[4] The trial court held that the thermometer was utility realty because it was similar to a railroad depot. The dissent agreed with the trial court, noting that the thermometer did not use a building, **(Footnote continued on the next page . . .)**

10

disagreed. We held that the thermometer was "akin to a warehouse" and not an essential part of the transportation service. *Id.* at 622. Accordingly, we held that none of the 72.63-acre parcel was utility realty and, thus, it was subject to local taxation.[5]

## Analysis

Railroad highlights the differences between its intermodal railroad terminal and the property at issue in *CSX*, which consisted principally of a multi-acre parking lot.[6] The property in *CSX* was the final destination for the cargo, *i.e.*, the automobiles, which were sorted in the thermometer. But for the sorting by CSX's affiliate, the task would have to be done by the dealers picking up their vehicles.

By contrast, Railroad's intermodal facility is not the final destination of the cargo. It is a place where Railroad's packers move containers from truck to train and vice versa for transit, not delivery. The cargo inside the containers is not unloaded and readied for delivery to the cargo's owner, as was the case in *CSX*. There is no building or warehouse involved in the intermodal transfer of containers, and the intermodal transfer facility bears no similarity to a warehouse.

---

**(continued . . .)**

as does a warehouse, and that historically depots had been considered essential to railroad transportation. *CSX*, 104 A.3d at 625.

[5] However, 8.62 acres occupied by tracks, railroad beds and land beneath the railroad beds was utility realty and exempt from taxation. This part of the trial court's decision was not appealed.

[6] In *CSX*, a third party was "responsible for unloading inbound automobiles from [the railroad's] rail cars and loading outbound automobiles onto automobile transport trailers operated by" various car dealers. *CSX*, 104 A.3d at 615. The car dealers were then required to "submit [the] required documentation to [the railroad's] security personnel[ ] and exit the facility with those loaded automobiles." *Id.*

The question is whether Railroad's intermodal facility is essential to the utility's transportation service and, thus, utility realty. One difficulty in answering this question arises from the fact that an intermodal rail facility did not become a feature of rail transportation until after 1968. As such, we need to draw upon analogous rail operations in use prior to 1968.

In *County of Erie v. Erie and Western Transportation Co.*, 87 Pa. 434 (1878), the County imposed real estate taxes on the railroad's real property where warehouses and elevators were located to store the grain that arrived by rail before it was loaded onto ships. Our Supreme Court held that the warehouses were not essential to the railroad's transportation service, explaining:

> We understand that the warehouses, the taxation of which is the subject of controversy, were used not only as storehouses, in the ordinary sense, but also for the transshipment of goods from vessels to railroads, and *vice versa*, from railroads to vessels. [Nevertheless, the property in question] must be regarded as warehouses and therefore taxable.

*Id*. at 437. In short, a warehouse to store goods, even when used to facilitate the transfer of those goods, was a warehouse subject to taxation.

A transfer of freight does not require that cargo be unloaded and placed in a warehouse. Railroads have long used switching yards to transfer freight cars from one train to another. A switching, or classification, yard works in the following manner:

> The immense increase in the volume and density of traffic upon American railroads since 1898 has compelled a complete reconstruction of terminals at all important points. These terminals now consist of at least two systems of ladder tracks operated by gravity, or by the hump and gravity systems combined. In one of these yards incoming trains are broken up and the cars distributed upon different sidings according to their

12

> destination. From these sidings strings of cars are pulled out and moved forward to another system of tracks constructed upon the same plan as the first, and there distributed upon sidings so as to constitute trains to be carried forward by connecting carriers. For trains moving in the opposite direction the process is simply reversed. Another ladder of sidings in the yard in which the cars were assembled into trains becomes a yard for classification, and the classification yard becomes the yard in which cars are assembled into trains to be carried forward in the opposite direction.

*Chicago, B. & Q.R. Co. v. United States*, 211 F. 12, 17 (8th Cir. 1913), *reversed*, *United States v. Chicago, Burlington & Quincy Railroad Company,* 237 U.S. 410 (1915). The question of whether switching yards were taxable prior to 1968 was answered in *City of Philadelphia, to Use of Pugh v. Philadelphia & R.R. Co.*, 1 Pa. Super. 236 (1895).

In *Pugh*, the City of Philadelphia placed a lien on property owned by a railroad, which included the railroad's switching yard. The property was described as follows:

> [T]he coal and iron terminal of the defendant company, and … the main tracks of the company's railroad enter the tract at a point to the south of the lot in question, and thence by numerous diverging branches and switches lead to the wharves, some twenty in number, where coal is loaded into vessels for export, and iron ore is received from vessels and loaded into cars.

*Id*. at 242. Iron ore and coal arrived at and left the terminal on the same tracks. However, the inner portion of the terminal consisted of diverging tracks for the purpose of classifying and storing freight while the main track was cleared. The city argued that the switching yard was not necessary and indispensable to the operation of the railroad. The Superior Court disagreed and held as follows:

13

> Applying these principles and endeavoring to follow the precedents, we confess we can see no difference for purposes of taxation between an intermediate section and a section at the end of a roadbed; and with our present information we are not prepared to say that the several diverging branches which lead to the wharves are not an integral part of the railroad.

*Id*. at 246. Because it was indispensable to the operation of the railroad, the Superior Court held that the switching yard was utility realty not subject to taxation by local taxing authorities.[7]

The grain warehouses in *Erie County* and the classification yard in *Pugh* were both used to facilitate the transfer of freight. However, the property at issue in *Erie County* consisted of buildings designed to store grain until it could be picked up by ships. By contrast, the classification yard in *Pugh* did not involve a building or the unloading of cargo but, rather, the transfer of box cars from one train to another train.

In the matter *sub judice*, Railroad has replaced the historical switching system with an intermodal system. Instead of using miles of rail lines for storing, moving and switching boxcars, Railroad uses a mobile crane unit to pull containers from trucks or trains and place them on the ground for temporary storage until they can be switched. This is the functional equivalent of a switching yard. Railroad's Property does for freight rail transportation what switch yards have done for the past 150 years.

Notably, there is express authority for the position that an intermodal facility is appropriately considered part of the railroad. Section 10102(6)(A) of the

---

[7] *See also Erie & W.V.R. Co. v. Public Service Commission*, 74 Pa. Super. 338, 345 (1920) (track leading from "main line of a railroad is variously described as a 'switch,' a 'siding,' a 'spur' or a 'branch.'").

Interstate Commerce Act defines "railroad" as "a bridge, car float, lighter, ferry, and *intermodal equipment* used by or in connection with a railroad." 49 U.S.C. §10102(6)(A) (emphasis added). This definition supports Railroad's argument that an intermodal facility is integral to its railroad service and, accordingly, utility realty.[8]

Because Railroad's intermodal railroad terminal is similar to a classification yard, which has historically been exempt from taxation, we conclude that the 85.01 acres at issue in the matter *sub judice* would have been exempt from taxation under pre-1968 law. Therefore, that portion of the Property is utility realty and not taxable by local taxing authorities.[9]

## PURTA Taxation Exemption

Railroad argues that the entire Property is exempt from any taxation. Because the trial court decided that the 85.01 acres were taxable by local taxing authorities, it did not reach Railroad's appeal of the decision of the Assessment Office that the 85.01 acres were not eligible for the tax exemption set forth in Section 1101-A(3)(ii) of PURTA, 72 P.S. §8101-A(3)(ii).[10] Accordingly, the

---

[8] In a land use case, *Choice Fuelcorp, Inc. v. Zoning Hearing Board of Armstrong County* (Pa. Cmwlth., No. 1515 C.D. 2012, filed May 16, 2013), this Court looked to Section 102 of the Interstate Commerce Act, which defines "railroad" to include a "switch, spur, track, terminal, terminal facility, and a freight depot, yard and ground used or necessary for transportation." 49 U.S.C. §10102(6)(c).

[9] The embankments and stormwater management pond also constitute utility realty because without that land, graded to meet the requirements for railroad tracks, Railroad could not be a "complete and perfect railroad." *See CSX*, 104 A.3d at 618 (quoting *Cumberland Valley Railroad Co. v. McLanahan*, 59 Pa. 23, 29 (1868)).

[10] In *dicta*, the trial court stated that "even if the [85.01 acres] were utility realty under PURTA, [they] would not be exempt from PURTA taxation." Trial court op. at 23. However, *obiter dictum* is not subject to appellate review.

15

matter must be remanded to the trial court for findings of fact and conclusions of law on this legal issue.

## Conclusion

For the above-stated reasons, the order of the trial court is reversed and remanded. The order is reversed with regard to the conclusion that the 85.01 acres were not utility realty. The matter is remanded to consider whether these acres are exempt from taxation under PURTA.

_____
MARY HANNAH LEAVITT, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Lehigh Valley Rail Management LLC, :
              Appellant :
               :
        v.            :   No 288 C.D. 2015
               :
County of Northampton Revenue : 
Appeals Board and County of : 
Northampton : 

## **O R D E R**

AND NOW, this 10th day of November, 2015 the order of the Northampton County Court of Common Pleas dated February 12, 2015, in the above-captioned matter is AFFIRMED insofar as it held that 22.92 acres of Lehigh Valley Management LLC's property is exempt from taxation, and REVERSED insofar as it held the remaining 85.01 acres of property were not utility realty.

The matter is REMANDED for findings of fact and conclusions of law on whether the 85.01 acres are exempt from any taxation.

Jurisdiction is relinquished.

_____
MARY HANNAH LEAVITT, Judge