IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Lehigh Valley Rail Management LLC | : | |
| | : | |
| v. | : | No. 2531 C.D. 2015 |
| | : | Argued: September 13, 2016 |
| County of Northampton Revenue Appeals Board and County of Northampton | : | |
| | : | |
| | : | |
| Appeal of: County of Northampton | : | |

BEFORE:    HONORABLE MARY HANNAH LEAVITT, President Judge
            HONORABLE P. KEVIN BROBSON, Judge (P)
            HONORABLE ANNE E. COVEY, Judge

OPINION
BY PRESIDENT JUDGE LEAVITT                      FILED:  February 6, 2018

Northampton County appeals an order of the Northampton County Court of Common Pleas (trial court) holding, on remand, that 85.01 acres of utility realty owned by Lehigh Valley Rail Management LLC (Railroad) were exempt from the tax on utility realty authorized by the Public Utility Realty Tax Act (PURTA).[1] The trial court explained that because this realty was used as an intermodal railroad yard for moving sealed cargo containers between trains and trucks and could not be used for any other purpose, it constituted "[r]ailroad beds or rails, land owned or used by a railroad as a right-of-way for a rail line and superstructures thereon[,]" and, thus, is exempt from the PURTA tax.  Section 1101-A(3)(ii) of PURTA, 72 P.S. §8101-A(3)(ii).[2]  We vacate and remand for more specific findings of fact and

---

[1] Article XI-A of the Tax Reform Code of 1971, Act of March 4, 1971, P.L. 6, *as amended*, added by Section 3 of Act of July 4, 1979, P.L. 60, *as amended,* 72 P.S. §§ 8101-A - 8112-A.

[2] The text of Section 1101-A(3)(ii) of PURTA is set forth in the text of the opinion, *infra.*

reverse the trial court's holding that Railroad's office and parking lot are exempt from the PURTA tax on utility realty.

## Background

Railroad is a public utility that owns and operates an intermodal rail yard located in the City of Bethlehem on 107.93 acres of land (Property). All of the activities on the Property are regulated by the Pennsylvania Public Utility Commission (PUC) as integral components of interstate freight transportation. The Property is used 365 days a year by inbound and outbound freight trains.

Freight arrives at this facility in sealed rail-ready containers, by train or by tractor trailer, and there it is transferred from train to tractor trailer or vice-versa, without being opened. The transfers take place in "aisles" between the railroad tracks. Daily and continuously, machines known as "packers" move through the aisles to transfer the sealed containers to and from rail cars. The packers lift each container from a truck (or train) and ground it for pick up and attachment to a train (or truck) for transportation to the next destination. The aisles are specifically sized and designed for the packers. Without these defined aisles and railroad tracks, there would be no way to transfer the containers to or from the trains. In addition, the Property is used to hold the containers until they are transferred. It is impossible to transfer each container immediately upon arrival. However, containers do not remain on the ground for more than 24 hours.

Of the 107.93 acres, 22.92 acres hold a series of railroad tracks laid parallel to one another. The remaining 85.01 acres are used in several different ways. These include: the aisles between the railroad tracks where the packers move; the ground where the containers are placed before being placed on a truck or a train; steep embankments that provide a level grade for the railroad beds; a water retention

2

pond to manage storm water on the site; a mobile office trailer with a parking lot for office staff and visitors; and a driveway into the Property used by trucks.

On June 26, 2013, the Northampton County Assessment Office issued a "Notice of Change" to Railroad asserting, for the first time, that the 85.01 acres were subject to local real estate taxes. The notice also asserted that the remaining 22.92 acres of railroad tracks were subject to the utility realty tax authorized by Section 1102-A(a) of PURTA.[3] Railroad appealed the Assessment Office's determination to the County of Northampton Revenue Appeals Board (Appeal Board).

After a hearing, the Appeal Board held that all 107.93 acres constituted utility realty and, as such, are exempt from local taxation. The Appeal Board referred the question of Railroad's eligibility for an exemption from the PURTA tax to the County Assessment Office. In response, the Assessment Office appraised the 85.01 acres of the land at $1,275,200 and held that it was subject to the PURTA tax, which is collected by the Commonwealth. The Assessment Office appraised the

---

[3] Section 1102-A(a) states:

> A tax is hereby imposed on the State taxable value of utility realty at a millage rate calculated under subsection (b). 72 P.S. §8102-A(a).

In turn, "subsection (b)" of Section 1102-A states:

> On or before November 1, 1999, for taxable year 1998, and on or before August 1, 2000, for taxable year 1999, and every year thereafter, the [D]epartment [of Revenue of the Commonwealth of Pennsylvania] shall calculate the millage rate for the taxable year and notify the public utility of the millage rate and the State taxable value of its utility realty. If an error in addition, subtraction, multiplication or division is present in a report or if an entry on a report is inconsistent with another entry and it is apparent which entry is correct, the millage rate shall be calculated using the correct mathematical result or entry. The public utility shall pay to the State Treasurer through the [D]epartment [of Revenue of the Commonwealth of Pennsylvania] a tax equal to the product of the millage rate and the State taxable value within forty-five days after the mailing date of the notice of determination.

72 P.S. §8102-A(b).

remaining 22.92 acres, consisting of railroad tracks, at $343,900 and held that it was exempt from the PURTA tax. Railroad appealed. Unexpectedly, the trial court reversed the Appeal Board's determination that the 85.01 acres constituted utility realty and held, instead, that they were subject to local taxation. The trial court agreed, however, that the 22.92 acres of railroad tracks were exempt from the PURTA tax. Railroad again appealed.

This Court reversed. It held that the 85.01 acres constituted utility realty, as had been held by the Appeal Board. *Lehigh Valley Rail Management LLC v. County of Northampton Revenue Appeals Board*, 126 A.3d 1076 (Pa. Cmwlth. 2015) (*Lehigh Valley I*). We explained that Railroad's intermodal railroad yard was the functional equivalent of a rail switching or classification yard, where boxcars are removed from an incoming freight train and placed on rail sidings where they are assembled and connected to the appropriate freight train. Historically, these yards have been exempt from local taxation. *Id.* at 1084. Accordingly, *Lehigh Valley I* remanded the case to the trial court to determine whether any part of the 85.01 acres was eligible for an exemption from the PURTA tax.

On remand, the trial court did not take any additional testimony or evidence. However, it made one additional finding of fact:

> The record indicates, and the site visit by [trial court] confirms, that there are no buildings on the Property aside from the [mobile] office trailer…which is not affixed to the ground.

Trial Court op., 11/20/2015, at 9. The trial court concluded that the 85.01-acre parcel was exempt from the PURTA tax because it consisted of "[r]ailroad beds or rails, land owned or used by a railroad as a right-of-way for a rail line and superstructures thereon." 72 P.S. §8101-A(3)(ii). The County appealed.

**Appeal**

4

On appeal,[4] the County argues that the trial court erred and abused its discretion in holding that the 85.01 acres were exempt from the PURTA tax. The County argues that "land owned or used by a railroad as a right-of-way" excludes the "land appurtenant" to railroad tracks, *i.e.*, the 85.01 acres. 72 P.S. §8101-A(3)(ii). The County argues that only the two steel rails and the land between them constitute a railroad "right-of-way" that is exempt from the PURTA tax; the remaining 85.01 acres are subject to the PURTA tax.

### *Lehigh Valley I*

Both parties repeat the arguments they presented in *Lehigh Valley I*, where the sole issue was whether the 85.01 acres constituted utility realty. In this appeal, the question is whether the 85.01 acres, or part thereof, constitute the type of utility realty exempted from the PURTA tax. For clarity, we begin with a review of *Lehigh Valley I.*

Historically, real property used by a utility to furnish a utility service was exempt from local taxation. On the other hand, real property used by a public utility for other profit-making ventures, such as a warehouse operation, were not considered "utility realty" and could be taxed by local taxing authorities. In 1968, the Pennsylvania Constitution was amended to authorize taxation of utility realty used to provide a utility service. Article VIII, Section 4 of the Constitution[5]

---

[4] When considering a tax assessment appeal, this Court's review determines whether the trial court committed an error of law or abused its discretion. *In re Appeal of Jubilee Ministries International*, 2 A.3d 706, 707 n.5 (Pa. Cmwlth. 2010).

[5] It states as follows:

> The real property of public utilities is subject to real estate taxes imposed by local taxing authorities. Payment to the Commonwealth of gross receipts taxes or other special taxes in replacement of gross receipts taxes by a public utility and the distribution by the Commonwealth to the local taxing authorities of the amount as

contemplates a "plan whereby an amount equivalent to what local taxing authorities could have raised is collected by the Commonwealth and distributed among local taxing authorities in an equitable manner." *American Telephone and Telegraph Co. v. Board of Property Assessment, Appeals and Review of Allegheny County*, 337 A.2d 844, 849 (Pa. 1975).

To determine what is "utility realty," the legislature provided a detailed definition. Section 1101-A(3) of PURTA defines utility realty as:

> *All lands*, together with all buildings, towers, smokestacks, dams, dikes, canals, cooling towers, storage tanks, reactor structures, pump houses, supporting foundations, enclosing structures, supporting structures, containment structures, reactor containment outer shells, reactor containment vessels, turbine buildings, recovery tanks, solid waste area enclosures, primary auxiliary buildings, containment auxiliary safeguard structures, fuel buildings, decontamination buildings, and, all other structures and enclosures whatsoever which are physically affixed to the land, no matter how such structures and enclosures are designated and without regard to the classification thereof for local real estate taxation purposes, but not including machinery and equipment, whether or not housed within such building,

---

herein provided shall, however, be in lieu of local taxes upon its real property which is used or useful in furnishing its public utility service. The amount raised annually by such gross receipts or other special taxes shall not be less than the gross amount of real estate taxes which the local taxing authorities could have imposed upon such real property but for the exemption herein provided. This gross amount shall be determined in the manner provided by law. An amount equivalent to such real estate taxes shall be distributed annually among all local taxing authorities in the proportion which the total tax receipts of each local taxing authority bear to the total tax receipts of all local taxing authorities, or in such other equitable proportions as may be provided by law.

> Notwithstanding the provisions of this section, any law which presently subjects real property of public utilities to local real estate taxation by local taxing authorities shall remain in full force and effect.

PA. CONST. art. VIII, §4.

6

structure or enclosure, or, after December 31, 1999, land and improvements to land that are indispensable to the generation of electricity, located within this Commonwealth that at the end of the taxable year are owned by a public utility or its affiliate either directly or by or through a subsidiary and are used or in the course of development or construction for use, in whole or in part, in the furnishing, including producing, storing, distributing or transporting, of public utility service and which are not subject to local real estate taxation under any law in effect on April 23, 1968: Provided, however, That the following specified items shall be exempt from the tax hereby imposed:

> (i)    Easements or similar interests.

> (ii)   Railroad beds or rails, land owned or used by a railroad as a right-of-way for a rail line and superstructures thereon. This subclause does not include stations, buildings, warehouses, shops, engine houses, plants or miscellaneous structures or the land appurtenant thereto.

> (iii)  Pole, transmission tower, pipe, rail or other lines whether or not said lines are attached to the land or to any structure or enclosure which is physically affixed to the land.

72 P.S. §8101-A(3). In short, a utility's land that was used to furnish the utility's service and, thus, exempt from local taxation prior to 1968 meets the definition of "utility realty." *Id.* Nevertheless, some utility realty was exempted from the new utility realty tax, just as it had been exempted from local taxation prior to 1968.

Prior to 1968, the standard for determining whether realty owned by a railroad utility could be taxed by local authorities was summarized as follows:

> It is only such property belonging to a railroad corporation as is appurtenant and indispensable to the construction and preparation of the road for use, that can claim to be exempt from taxation; such property as is only indispensable to the making of profits being liable to taxation.

7

*Railroad v. Berks County*, 6 Pa. 70, 70 (Pa. 1847).  In sum, realty "indispensable" to the railroad's operation was exempt, but other realty could be taxed by local taxing authorities.  Our Supreme Court offered examples of how to apply the distinction:

> *[W]ater stations and depots*--by which latter is to be understood, the offices, oil houses, and *places to hold cars, and such places and buildings as may fairly be deemed necessary and indispensable to the construction of the road--are not taxable*; whilst warehouses, coal-lots, coal-shutes, machine-shops, wood-yards, and the like, are taxable.

*Id*. (emphasis added).

The question in *Lehigh Valley I* was whether Railroad's intermodal facility would have been taxed by local government prior to 1968.[6]  This inquiry was complicated by the fact that intermodal rail facilities did not become a feature of rail transportation until after 1968.[7]  This required a study of how analogous rail operations were treated prior to 1968.

---

[6] The parties agreed that the intermodal facility satisfied the other definitional requirements for "utility realty" because it was located in Pennsylvania, owned by a public utility and used, in whole or part, to furnish the utility's service.  72 P.S. §8101-A(3).

[7] Before the trial court, Railroad offered the following historical perspective:

> While intermodal transport was first offered during the 1960s, its use did not grow substantially until the 1970s and 1980s.  ATKINSON, DUNN, HENNESSY, TRAIN: THE DEFINITIVE VISUAL HISTORY, 223, (Dorlin Kindersley et al. eds., New York, 2014).  "[I]n 1957, [intermodal transport] accounted for less than 1% of U.S. rail freight, but by the mid 1980s, more than 15% of freight was transported this way."  *Id.*  Historians agree that while the concept of self-contained intermodal transport was "quite ahead of its time, it didn't really take off until the 1980s."  STEVE BARRY, RAILROAD ROLLING STOCK, 102-3, (Voyager Press, Minneapolis, 2008).  Moreover, intermodal transport did not have a significant presence in Pennsylvania until the late 1990s.  Norfolk Southern annexed former Conrail lines in 1999, adding more coal traffic through western Pennsylvania from the Allegheny Mountains.  *Id.* at 103.  Following this annexation, Norfolk Southern moved the

A railroad switching yard operates in the following manner:

> [I]ncoming trains are broken up and the cars distributed upon different sidings according to their destination. From these sidings strings of cars are pulled out and moved forward to another system of tracks constructed upon the same plan as the first, and there distributed upon sidings so as to constitute trains to be carried forward by connecting carriers. For trains moving in the opposite direction the process is simply reversed. Another ladder of sidings in the yard in which the cars were assembled into trains becomes a yard for classification, and the classification yard becomes the yard in which cars are assembled into trains to be carried forward in the opposite direction.

*Chicago, B. & Q.R. Co. v. United States*, 211 F. 12, 17 (8th Cir. 1913), *reversed on other grounds by United States v. Chicago, B. & Q.R. Co.,* 237 U.S. 410 (1915). Prior to 1968, rail switching yards in Pennsylvania were not subject to local taxation. *City of Philadelphia, to Use of Pugh v. Philadelphia & R.R. Co.*, 1 Pa. Super. 236 (1895).

In *Pugh*, the City of Philadelphia placed a lien on property used as the railroad's switching yard. The property was described as follows:

> [T]he coal and iron terminal of the defendant company, and … the main tracks of the company's railroad enter the tract at a point to the south of the lot in question, and thence by numerous diverging branches and switches lead to the wharves, some twenty in number, where coal is loaded into vessels for export, and iron ore is received from vessels and loaded into cars.

---

bulk of its intermodal traffic to the east of the state; trains were moved to twelve (12) hubs, before being broken apart into individual trailers.

Reproduced Record at 149a (R.R. ___).

*Id*. at 242. The City argued that the switching yard was not necessary and indispensable to the operation of the railroad. The Superior Court disagreed, explaining as follows:

> [E]ndeavoring to follow the precedents, we confess we can see no difference for purposes of taxation between an intermediate section and a section at the end of a roadbed; and with our present information we are not prepared to say that the several diverging branches which lead to the wharves are not an integral part of the railroad.

*Id*. at 246. The Superior Court's holding was consistent with our Supreme Court's instruction that "places [used] to hold cars" are "necessary and indispensable to the construction of the road …" and, thus, exempt from local taxation. *Railroad v. Berks County,* 6 Pa. at 70.[8]

Drawing on this precedent, we held in *Lehigh Valley I* that an intermodal facility functions like a railroad switching or classification yard. Instead of using only rail lines for storing, moving and switching boxcars, Railroad uses a combination of rail lines, truck lanes and a mobile crane unit for storing, moving and switching rail-ready containers. Railroad's facility does for freight rail transportation what switching yards have done for the past 150 years. This is why the Interstate Commerce Act defines a "railroad," *inter alia*, as "intermodal equipment used by or in connection with a railroad." 49 U.S.C. §10102(6)(A).[9] In

---

[8] *See also Erie & W.V.R. Co. v. Public Service Commission*, 74 Pa. Super. 338, 345 (1920) (track leading from "main line of a railroad is variously described as a 'switch,' a 'siding,' a 'spur' or a 'branch.'").

[9] Section 10102(6)(A) of the Interstate Commerce Act defines "railroad" as "a bridge, car float, lighter, ferry, and *intermodal equipment* used by or in connection with a railroad." 49 U.S.C. §10102(6)(A) (emphasis added). Further, in a land use case, *Choice Fuelcorp, Inc. v. Zoning Hearing Board of Armstrong County* (Pa. Cmwlth., No. 1515 C.D. 2012, filed May 16, 2013), this

10

sum, Railroad's intermodal facility would have been exempt from local taxation under pre-1968 law and, thus, satisfied the statutory definition of "utility realty."[10]

Lehigh Valley I reversed the trial court and reinstated the holding of the County Appeal Board that the 85.01 acres constituted utility realty. We remanded the matter to the trial court for a determination on whether the 85.01 acres, in part or whole, were exempt from the PURTA tax, as asserted by Railroad.

On remand, the trial court held that all 85.01 acres were exempt from the PURTA tax. The County asserts that the trial court misconstrued PURTA's tax exemption.

## PURTA Taxation Exemption

We return to the text of PURTA. As noted above, PURTA's definition of utility realty contains an exemption from the PURTA tax for some species of utility realty.[11] Section 1101-A(3) states that:

> [T]he following specified items shall be exempt from the tax hereby imposed:
>
> (i)   Easements or similar interests.

---

Court looked to a different subsection of the same definition that defines "railroad" to include a "switch, spur, track, terminal, terminal facility, and a freight depot, yard, and ground, used or necessary for transportation." 49 U.S.C. §10102(6)(C).

[10] We held the embankments and stormwater management pond to constitute utility realty because without that land, graded to meet the requirements for railroad tracks, Railroad could not be a "complete and perfect railroad." Lehigh Valley I, 126 A.3d at 1084 n.9 (quoting Cumberland Valley Railroad Co. v. McLanahan, 59 Pa. 23, 29 (1868)).

[11] It is well established that "[t]axing statutes should receive a strict construction." Commonwealth v. Philadelphia Rapid Transit Company, 134 A. 455, 456 (Pa. 1926). On the other hand, where a "taxing provision is an 'exemption' [it is] to be strictly construed against [t]axpayers." Adelphia House Partnership v. Commonwealth, 709 A.2d 967, 970 (Pa. Cmwlth. 1998). Here, we consider the meaning of "[r]ailroad beds or rails, land owned or used by a railroad as a right-of-way for a rail line and superstructures thereon," which is an exemption. 72 P.S. §8101-A(3)(ii).

11

(ii)  *Railroad beds or rails, land owned or used by a railroad as a right-of-way for a rail line and superstructures thereon.*  This subclause does not include stations, buildings, warehouses, shops, engine houses, plants or miscellaneous structures or the land appurtenant thereto.

(iii)  Pole, transmission tower, pipe, rail or other lines whether or not said lines are attached to the land or to any structure or enclosure which is physically affixed to the land.

72 P.S. §8101-A(3)(i)-(iii) (emphasis added).

The County argued that the phrase "[not the] land appurtenant thereto" in the second sentence of Subsection (ii) applied also to the first sentence therein. Accordingly, the aisles and embankments "appurtenant" to the railroad tracks did not fall within the exemption.

The trial court rejected the County's argument.  It construed Section 1101-A(3)(ii) as follows:

Given the placement of the words "the land appurtenant thereto" in the sentence which clarifies what is not exempt, we construe the phrase to refer to the land appurtenant to "stations, buildings, warehouses, shops, engine houses, plants or miscellaneous structures" *and not the land appurtenant to "railroad beds or rails, land owned or used by a railroad as a right-of-way* for a rail line and superstructures thereon."

Trial Court op., 11/20/2015, at 24 (emphasis added).  The trial court explained that

we decline to find that the phrase 'land appurtenant thereto' applies to negate the exemption provided for in the first sentence of the subclause by rendering taxable 'land appurtenant' to railroad beds or rails, land owned or used by a railroad as a right-of-way for a rail line and superstructures thereon.

*Id.*  Rather, the trial court held that the phrase "land appurtenant thereto" applied only to "stations, buildings, warehouses, shops, engine houses, plants or

12

miscellaneous structures," *i.e.*, the second sentence in subsection (ii). 72 P.S. §8101-A(3)(ii). We agree.

The County next argues that the "railroad beds or rails, land owned or used by a railroad as a right-of-way for a rail line and superstructures thereon" does not include Railroad's intermodal facility, save for the railroad tracks themselves. Railroad argues that the County conflates the meaning of "right-of-way" with railroad tracks.

PURTA does not define "railroad beds," "rails," "land owned or used by a railroad as a right-of-way for a rail line," or "rail line." However, we have close to 200 years of jurisprudence that has given meaning to these terms. The legislature drew on that precedent to fashion the tax exemption set forth in Section 1101-A(3) of PURTA. For example, in *Railroad v. Berks County*, 6 Pa. at 70, our Supreme Court held that "warehouses," "machine shops" and "the like" are taxable by local taxing authorities notwithstanding their ownership by a utility. Section 1101-A(3)(ii) retains that precedent by clarifying that the PURTA tax exemption does not apply to "stations, buildings, warehouses, shops, engine houses, plants or miscellaneous structures" owned by a railroad utility. 72 P.S. §8101-A(3)(ii).

A railroad "right-of-way" is broader in scope than a pair of steel railroad tracks. *St. Louis, Kansas City & Colorado Railroad Company v. Wabash Railroad Company*, 217 U.S. 247, 253 (1910) (noting that a railroad right-of-way describes the entire owned or leased strip or tract used for a railroad purpose, not "the limited part thereof upon which its main track or other specified improvements are located.") (citations omitted). The dimensions of a railroad right-of-way vary. For example, in *Borough of Mt. Pleasant v. Baltimore & Ohio Railroad Company*, 20 A. 1052 (Pa. 1891), our Supreme Court described a railroad's right-of-way as a

13

"narrow strip of ground."[12]  In comparison, the General Railroad Right-of-Way Act of 1875 granted railroads rights-of-way across public lands of the United States "'to the extent of one hundred feet on each side of the central line of said road.'"  *Marvin M. Brandt Revocable Trust v. United States*, 134 S.Ct. 1257, 1261 (2014) (quoting 43 U.S.C. §934 (repealed)).  Similarly, Section 10 of Pennsylvania's Railroad Act[13] stated that "the president and directors of such company shall have power and authority … to survey, ascertain, locate, fix, mark, and determine such route for a railroad as they may deem expedient … and *not except in the neighborhood of deep cuttings, or high embankments, or places selected for sidings, turnouts, depots, engine or water stations*, *to exceed sixty feet in width*, and thereon to lay down, erect, construct and establish a railroad...."  Formerly 67 P.S. §271 (repealed) (emphasis added).  Stated otherwise, the 60-foot width for a railroad "route" was to be expanded where necessary for the embankments and sidings needed for the railroad. Our Superior Court specifically construed Section 10 of the Railroad Act to mean that a "railroad right of way is not confined to the portion of ground occupied by its tracks."  *Lacy v. Montgomery*, 124 A.2d 492, 497 (Pa. Super. 1956).[14]

---

[12] *Borough of Mt. Pleasant* involved a municipal assessment upon adjacent property owners for the cost of paving a road or "footway."  Where the adjacent property is a "road-bed or right of way of a railroad company," it cannot be "the subject of a claim for paving."  *Borough of Mt. Pleasant,* 20 A. at 1053.  By contrast, a railroad company's ground "used as a lumberyard" may be assessed. *Id.*  The Supreme Court held this was logical because the paved road or sidewalk would benefit those making their way to the lumberyard.

[13] Act of February 19, 1849, P.L. 79, *as amended*, 67 P.S. §271.  The Railroad Act was replaced, in part, by the Public Service Company Law, Act of July 26, 1913, P.L. 1374, which was later replaced by the Public Utility Code, 66 Pa. C.S. §§101-3316.

[14] The Superior Court specifically noted that the general 60-foot width of a right-of-way did not apply "*in the neighborhood of deep cuttings or high embankments or places selected for sidings*, turnouts, depots, engine or water stations."  *Lacy,* 124 A.2d at 497 (emphasis added).

14

In *Rodgers v. Pittsburgh, Fort Wayne & Chicago Railway Company,* 100 A. 271, 272 (Pa. 1917), our Supreme Court held that a railroad company could establish a right-of-way "indefinite in width." The amount of land taken for this purpose could be of "such width" as the "board of directors, in the exercise of their honest judgment, deemed necessary for the future as well as for then existing railroad purposes." *Id.* at 271. The Supreme Court upheld the trial court's conclusion that the railroad's right-of-way was 80 feet wide, notwithstanding the fact that for many years it had used only 32 of the 80 feet in its right-of-way.

In short, a "railroad right-of-way" is not co-terminus with the railroad bed and steel tracks, as argued by the County. Further, the width of a "railroad right-of-way" is not a fixed dimension; it changes with the railroad's needs. As the Superior Court has observed, the "'right of way of a railroad company, *whatever its established width*, as soon as acquired is impressed with a public use; it constitutes a public highway.'" *PA Energy Vision, LLC v. South Avis Realty, Inc.*, 120 A.3d 1008, 1014 (Pa. Super. 2015) (quoting *Conwell v. Philadelphia and Reading Railway Company*, 88 A. 417, 418 (Pa. 1913) (emphasis added)).

In *CSX Transportation, Inc. v. Delaware County Board of Assessment Appeals*, 104 A.3d 612 (Pa. Cmwlth. 2014), this Court noted that land acquired for sidings and turnouts could be termed part of the road bed:

> *See Borough of Aliquippa v. Pittsburgh & Lake Erie R.R. Co.*, 94 Pa. Super. 279, 288 (1928) ("A railroad company is authorized to condemn by appropriate proceedings for roadbed a strip of land of the width authorized by statute; and it may, in addition, acquire land for sidings and turnouts for the speedy and safe passage of its cars; *land so acquired would properly be termed roadbed, and be exempt from taxation*[.]") In *Aliquippa,* although a slope adjacent to the track was deemed necessary to the stability of the track and was exempt from a municipal claim for paving, the railroad admitted that the station house portion of

15

> the subject property was subject to assessment. The Court determined that the lower court had properly found the exemption did "not extend to station houses, platforms and other property of the railroad, not absolutely necessary to the exercise of the franchise of the corporation." *Id.* at 286.

*CSX*, 104 A.3d at 622, n.5 (emphasis added). At times, "road bed" and "right-of-way" have been used interchangeably.

The term "rails" refers to bars of steel forming the track to carry railroad cars. *Southern Pacific Transportation Company v. Commissioner of Internal Revenue*, 75 T.C. 497, 709 (1980), *supplemented sub nom. Southern Pacific Transportation Company v. Commissioner of Internal Revenue*, 82 T.C. 122 (1984) ("Rail is the portion of the railroad track structure which carries the wheels of railroad rolling stock; it is the load-carrying steel member of the track.").

Finally, precedent teaches that the term "rail line" refers to the route of the railway, not a track. *See Quarry Office Park Associates v. Philadelphia Electric Company*, 576 A.2d 358, 359 (Pa. Super. 1990) ("The rail line was established in 1851 and 1852 … [t]he rail line extends for approximately seven miles, from Tredyffrin Township in Chester County on the western end to King of Prussia, Montgomery County on the eastern end."). Stated otherwise, the "rail line" constitutes the "main tracks of the company's railroad." *Pugh*, 1 Pa. Super. at 242.

The terms "railroad beds," "rails," and "land owned or used by a railroad as a right-of-way for a rail line," as used in Section 1101-A(3)(ii) of PURTA, denote different things. We reject the County's argument that the PURTA tax exemption is limited to the land occupied by the steel rails and the land beneath them. The legislature could have chosen this simple way to express the tax exemption, but it did not. The County's narrow interpretation of the exemption would render most of the words in Section 1101-A(3)(ii) surplusage. *Matter of*

16

*Employees of Student Services, Inc.*, 432 A.2d 189, 195 (Pa. 1981) ("Each word in a statutory provision is to be given meaning and not to be treated as surplusage.").

The County next directs this Court to *CSX Transportation*, 104 A.3d 612, to support its contention that the 85.01 acres of Railroad's Property are subject to the PURTA tax. In that case, this Court considered whether realty owned by CSX Transportation (CSXT) could be taxed by local taxing authorities. Of the 90.2 acres, 60.98 acres were paved with macadam; 8.62 acres were occupied by railroad tracks, railroad beds and land thereunder; and 7.883 acres, commonly referred to as "the thermometer," was used to move automobiles to their assigned parking spaces on the 61-acre macadam parking lot. This Court concluded that "the 72.63 acres which includes the 'thermometer' … is not part of CSXT's railroad right-of-way," but rather akin to a warehouse and, thus, subject to local real estate taxation. *Id.* at 622-23. In short, it was not utility realty.

In *Lehigh Valley I*, this Court distinguished an intermodal facility from a thermometer. This Court held that the land on which the packers operate was part of the Railroad's intermodal facility and explained that

> [i]nstead of using miles of rail lines for storing, moving and switching boxcars, Railroad uses a mobile crane unit to pull containers from trucks or trains and place them on the ground for temporary storage until they can be switched.

*Id.* at 1084. Further, with regard to the land on which the packers operate, this Court stated, "[t]here is no building or warehouse involved in the intermodal transfer of containers, and the intermodal facility bears no similarity to a warehouse." *Id.* at 1083.

There is a key factual difference between the thermometer in *CSX Transportation* and the intermodal facility at issue in *Lehigh Valley I*. Freight was

17

unloaded from the train when it reached the thermometer. By contrast, freight is not unloaded in the intermodal facility. The goods remain locked up in sealed containers. The intermodal facility is a stop along the train's journey from point A to point B. It functions as a switching, or classification, railroad yard.

More importantly, *CSX Transportation* states that the PURTA tax exemption applies to "those essential, indispensable parts necessary to operate the railroad." *CSX Transporation*, 104 A.3d at 622. "Places [used] to hold [railroad] cars" are "necessary and indispensable … to the road." *Berks Co.*, 6 Pa. at 70. This is why railroad switching yards were historically exempt from taxation as "railroads." *Pugh*, 1 Pa. Super. 236 (1895). Lest there be any doubt, a "railroad right-of-way is not confined to the portion of ground occupied by its tracks." *Lacy*, 124 A.2d 492, 497 (Pa. Super. 1956). In short, *CSX Transportation* does not support the County's contention that the entirety of the 85.01 acres is taxable under PURTA.

Land is exempt from the PURTA tax only if it is an "essential, indispensable part[ ] necessary to operate the railroad." *CSX Transportation*, 104 A.3d at 622. Several parts of the 85.01 acres meet that definition. This includes the aisles between the railroad tracks where the packers move, the ground where the containers are placed before being loaded on a truck or train, the steep embankments that provide a level grade for the railroad beds and the water retention pond.

There are no "stations, buildings, warehouses, shops, engine houses, [or] plants" on the 85.01 acres of Railroad's Property at issue. 72 P.S. §8101-A(3)(ii). However, the Property does contain "miscellaneous structures [and] land appurtenant thereto." *Id.* Specifically, there is an office trailer and an adjacent parking lot, with approximately 16-17 spaces, for employees. The trial court

18

acknowledged that the office trailer is a "structure." Trial Court op., 11/20/2015, at 24-25. Finally, the Property has a driveway used for truck ingress and egress.[15]

Under PURTA, "buildings, warehouses ... or miscellaneous structures" are not necessary to operate a railroad and, thus, not eligible for the tax exemption. 72 P.S. §8101-A(3)(ii). Accordingly, the land dedicated to the mobile office trailer and parking lot is subject to the PURTA tax. The Railroad's office trailer is not exempt from the PURTA tax because it constitutes a "building" or "miscellaneous structure." 72 P.S. §8101-A(3)(ii). The parking lot is land "appurtenant thereto," *i.e.*, to the office trailer. According to the affidavit of Patrick R. Loughlin, which was submitted by Railroad, the area occupied by the trailer and staff parking is approximately 70' by 300' (21,000 square feet +/- 0.5 acres). R.R. 276a-278a. This portion of the 85.01 acres is subject to the PURTA tax.

When this Court ordered a remand in this appeal, it was not known how many acres constituted the driveway used to enter the intermodal railroad yard; how many feet separated the tracks, *i.e.*, the width of the aisles between the tracks; the total acreage of the aisles for packers; or how many acres are dedicated to the embankments and retaining pond, which are "necessary to operate a railroad." 72 P.S. §8101-A(3)(ii). The trial court did not make factual findings on the dimensions of each separate use of the 85.01-acre parcel, which are needed to determine the acreage that is subject to the PURTA tax and the acreage that is exempt. Accordingly, we remand this matter to the trial court to determine the dimensions of the various uses of the land that make up the 85.01 acres of the Property and, then, make conclusions of law, consistent with this opinion, on whether each acre committed to that use satisfies the exemption in Section 1101-A(3)(ii) of PURTA.

---

[15] The record established that Railroad does not own any of the trucking businesses that deposit or remove containers, and it does not profit from their activities.

19

## Conclusion

For the above-stated reasons, we again remand this matter to the trial court. Specifically, on remand, the trial court shall determine the dimensions of the following: (1) the aisles between the railroad tracks where packers move; (2) the ground where the containers are placed before being loaded onto a truck or train; (3) the steep embankments that provide a level grade for the railroad beds; (4) the water retention pond; (5) the office trailer and parking lot; and (6) the driveway into the Property used by trucks. In addition, the trial court shall determine the dimensions of all other areas of the Property not described herein and render conclusions of law, consistent with this opinion, on whether each area satisfies the exemptions listed in Section 1101-A(3)(ii) of PURTA for "railroad beds or rails, land owned and used by a railroad as a right-of-way for a rail line and superstructures thereon." 72 P.S. §8101-A(3)(ii). We reverse the trial court, insofar as it held that the land on which the trailer and the staff parking lot are exempt.

_____
MARY HANNAH LEAVITT, President Judge

20

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Lehigh Valley Rail Management LLC

v.

County of Northampton Revenue Appeals Board and County of Northampton

Appeal of: County of Northampton

:
:
:
:
:
:
:
:
:
:
:
:
:

No. 2531 C.D. 2015

## **O R D E R**

AND NOW, this 6th day of February, 2018, the order of the Court of Common Pleas of Northampton County, dated November 20, 2015, is VACATED. The matter is REMANDED to the trial court to determine the dimensions of the various uses of the 85.01-acre parcel and to make conclusions of law regarding whether each use satisfies the exemption in Section 1101-A(3)(ii) of the Public Utility Realty Tax Act, Article XI-A of the Tax Reform Code of 1971, Act of March 4, 1971, P.L. 6, *as amended*, added by Section 3 of Act of July 4, 1979, P.L. 60, *as amended,* 72 P.S. §8101-A(3)(ii), as set forth in further detail in the attached opinion. In addition, we REVERSE the trial court, in part, and hold that the land on which the trailer and the staff parking lot are located is subject to the PURTA tax.

Jurisdiction relinquished.

_____
MARY HANNAH LEAVITT, President Judge