J-A23021-24

2025 PA Super 225

| | | |
|---|---|---|
| READING BLUE MOUNTAIN AND NORTHERN RAILROAD COMPANY | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | No. 68 MDA 2024 |
| TIMOTHY AND SUEANN MOUNT | : | |

Appeal from the Judgment Entered January 3, 2024
In the Court of Common Pleas of Luzerne County Civil Division at No(s):
201505426

BEFORE:  BOWES, J., OLSON, J., and STABILE, J.

OPINION BY BOWES, J.:                    **FILED: OCTOBER 1, 2025**

Reading Blue Mountain and Northern Railroad Company ("BM&N") appeals from the January 3, 2024 judgment entered in the boundary dispute between BM&N and landowners Timothy and Sueann Mount regarding the location of BM&N's right-of-way.  We affirm.

The Mounts own three adjacent lots in Luzerne County, which are bounded by Main Street on the east and a portion of BM&N's rail line on the west.  Pertinent to this appeal, from 2000 to 2018, the Mounts operated a restaurant in a structure erected around 1903, as part of a former feed mill operation, on their northernmost property.  In 2014, the Mounts expressed concern to BM&N regarding train passengers disembarking for bicycle tours and crossing the Mounts' property.  Following that exchange, a representative from BM&N approached the Mounts to sign a lease, claiming that the Mounts'

structure was on the railroad's right-of-way. Ultimately, these interactions gave rise to the instant dispute as to whether the Mounts' restaurant building protruded into the railroad's right-of-way for operation of its rail service. BM&N claimed it did, whereas the Mounts insisted that the railroad's right-of-way did not extend that far onto the Mounts' land.

Unable to resolve the disagreement amicably, BM&N initiated the underlying matter in 2015, by filing a complaint against the Mounts sounding in ejectment and trespass. The railroad sought, *inter alia*, a court order directing the Mounts to remove the portion of the building it claimed was on its property and right-of-way.[1] In response, the Mounts filed an answer, new matter, and counterclaim, asserting quiet title, trespass, and set off.

Following a significant period of inactivity, the court held a nonjury trial in 2022. Relevantly, BM&N presented Michael Bercek, an expert in land surveying, to support its claim that a portion of the Mounts' building encroached upon its right-of-way. He testified that the deed for the Mounts' properties indicated that the Mounts' property was bounded on the west by the property of the railroad. According to him, the railroad's property, which included the land occupied by its right-of-way, extended into a portion of the subject building. In determining the dividing line between the property of the

---

[1] Although at times this stretch of land is referred to in the record and briefs simply as BM&N's "property," we note that BM&N did not assert its ownership outright, but rather alleged the Mounts' structure and some of their land encroached upon BM&N's right-of-way. It is the location and width of this right-of-way with which this appeal is concerned.

Mounts and BM&N, Mr. Bercek prepared a survey that included the Mounts' three properties, as well as two northern neighbors. Notably, the demarcating line as it appears on the survey is not equidistant from the railroad tracks for each of those properties. Instead, it progressively expanded further east as it ran from north to south, such that it encroached further upon the Mounts' land than that of their northern neighbors, and intersected the Mounts' structure. On cross examination, the Mounts highlighted that Mr. Bercek did not include on the survey all the necessary measurements for the location of the railroad's right-of-way, such as the distance from Main Street to the railroad tracks and from the back of the building to the tracks, nor could he supply them in court.

After taking the matter under advisement, the court found in favor of the Mounts on their quiet title action, determining that their lots extended sixty-six feet west from Main Street. Since it determined that the Mounts owned the contested portions of land, it rejected BM&N's action to eject the Mounts or any part of their building. Nonetheless, the order provided that if the Mounts occupied any land west of that sixty-six-foot line, which no evidence indicated it did, BM&N would have the right to eject them. Finally, the court denied all requests for damages.

Critically, the court used the sixty-six foot measurement from tax assessment records because "neither party provided the court with a survey that depicted any measured distances or depths of [the Mounts'] property running westerly from Main Street[.]" Trial Court Opinion, 3/8/24, at 10

(some capitalization altered, pagination supplied). However, measuring the Mounts' property as such placed the southwestern corner of their lots on the other side of the railroad tracks. Since this was further west than the court had intended to draw the line between the landowners, it granted BM&N's post-trial motion, vacated its verdict, and ordered a new trial limited to the location of the right-of-way boundary line.

At the 2023 re-trial, Mr. Bercek again testified for BM&N. He once again neglected to include concrete measurements so as to affirmatively establish BM&N's right-of-way. For example, despite the right-of-way not being a uniform width between the tracks and the neighboring properties as it ran north to south, the survey only included measurements for two widths: one at the southern boundary of the Mounts' property, and the other at a point between two of the northern neighbors' properties. Notably, the measurements were set at different angles without explanation. Critically, the survey did not include the distance between the railroad and the end of the right-of-way where the building sat, nor the measurements for the alleged encroachment. Moreover, the survey did not detail the distance from Main Street to the right-of-way or the railroad, or from the rear of the building to the railroad.

The Mounts declined to call an expert to establish the boundary line for the right-of-way, instead arguing their long-held belief that the right-of-way extended to the edge of the railbed, which they measured as approximately

ten feet from the easternmost rail. Mr. Mount crafted a ten-foot length of PVC pipe for use as an aid during the subsequent site visit to the properties.

Ultimately, the court determined that BM&N's right-of-way spanned twelve and one-half feet from the centerline of its railroad tracks, effectively adopting the Mounts' proposed demarcation. Specifically, it ordered in pertinent part as follows:

1. The court finds that the [Mounts]' property . . . extends in a westerly direction from Main Street to the edge of [BM&N]'s easterly railroad right-of-way, which, for purposes of this litigation, the court has determined shall be on a line measured twelve and one-half feet from the centerline of the existing tracks of [BM&N]'s railroad.

2. In accordance with the court's finding in [¶] #1 above, the court finds in favor of [BM&N] on [its ejectment and trespass counts] only to the extent that [the Mounts] occupy any portion of land that extends into [BM&N]'s easterly railroad right-of-way.

3. In accordance with the court's finding in [¶] #1 above, the court finds in favor of [the Mounts] on [their quiet title action] with respect to only that portion of land that is within their property depth from Main Street.

Decision, 9/18/23, at 1-2 (pagination supplied, some capitalization altered, parenthetical numbers omitted).

This finding comported with the court's earlier conclusion that BM&N was not entitled to eject the Mounts because its right-of-way, as so measured, did not include any portion of the land upon which the Mounts' building sat. The trial court explained its calculation thusly:

At the view, Mr. Mount demonstrated, without objection, how he had measured [ten] feet from [BM&N]'s easterly railroad track,

using a [ten]-foot piece of [one]-inch PVC pipe, to create the line he drew on [Exhibit] D-93. The court observed that in each position that he measured, [ten] feet was beyond the large stones or sub-ballast that forms the base of the railroad bed. In addition, the court observed that several of the properties to the north of [the Mounts'] property appear to have property lines even closer to the railroad tracks than the [Mounts]' building is.

Once again, as after the first trial, the court was left with no exhibit or map from either party showing a definitive measurement for the northerly and southerly boundary lines of [the Mounts]' property. It was clear from an observation of the railroad tracks in relation to [the Mounts]' building and land, and in relation to the properties to the north of [their] property on the easterly side of [BM&N]'s tracks, that the land claimed by [BM&N] where it adjoins [the Mounts]' property was far in excess of that which is needed and has been used by [BM&N] (and their predecessors in title) for the operation of its railroad for 120 years or more. [BM&N] presented no evidence (and the court observed none) that would lead the court to conclude that [it] required any more land for the operation of its railroad than that extending to the edge of the sub-ballast. Based upon the court's observation during the view of the property and [BM&N]'s Exhibit P-9, the distance between the rails of [BM&N's] track appears to be approximately five feet, and the distance from the outside of the easterly rail to the edge of the sub-ballast appears to be approximately [ten] feet. Accordingly, the court established, for purposes of this litigation only, a right-of-way measured [twelve] and [one-half] feet from the centerline of [BM&N]'s railroad track as the westerly boundary of [the Mounts]' property.

Trial Court Opinion, 3/8/24, at 12-13 (some capitalization altered, parenthetical numbers omitted, pagination supplied).

For reference, we enhanced Exhibit D-95 by thickening the line drawn by the Mounts, as seen looking north towards the impacted building:



Additionally, we include the following marked-up version of Mr. Bercek's survey, D-93. This image portrays both parties' proposed boundaries, the affected building (located on lot 47), the location of the railroad tracks, and a rectangle showing the initial outline of the Mounts' three lots crossing over a

portion of the tracks as found by the court in 2022, before it granted BM&N's

request for a new trial:



Following post-trial practice and the entry of judgment, BM&N appealed

to this Court.[2]  It raises the following issues for our consideration:

> A. Whether the trial court erred in determining that the doctrine
> of laches was available as a defense to [BM&N]'s otherwise
> valid, superior claim to the Property, and erred in holding that
> [BM&N]'s ejectment claim was barred by the doctrine of laches.

---

[2] The trial court did not order BM&N to file a concise statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(b).  Nonetheless, the court authored a Rule 1925(a) opinion explaining its decision.

B. Whether the trial court erred and/or abused its discretion in finding in [¶] 1 of the September 18, 2023, Decision, and as discussed in its March 8, 2024, opinion, that the Mounts' property extends in a westerly direction and "shall be on a line measured twelve and one-half feet from the centerline of the existing tracks of [BM&N's] railroad" which was contrary to the only competent evidence presented at trial, including the actual Deed of the Mounts' property and the professional land survey of the property by expert land surveyor [Mr.] Bercek as describing the Mounts' property as extending "to the Lehigh Valley Railroad."

    1. Whether the trial court erred in relying on Luzerne County Tax Assessment Records instead of the professional land survey performed by Mr. Bercek and submitted by [BM&N].

C. Whether the trial court erred and/or abused its discretion in finding in [¶] 2 of the September 18, 2023, Decision, and as discussed in its March 8, 2024, opinion, in favor of [BM&N] on Count I, seeking ejectment, and Count II, in trespass, of its Complaint "only to the extent that [the Mounts] occupy any portion of land that extends into [BM&N's] easterly railroad right-of-way" as such limited finding is not supported by competent evidence, and is contrary to the undisputed and uncontested competent evidence presented by [BM&N].

D. Whether the trial court's erroneous decision divests [BM&N] of title to its property, which is an active right[-]of[-]way upon which an active railroad line operates, which was unequivocally established by competent and uncontested evidence in the form of the professional land survey performed by Mr. Bercek offered by [BM&N].

E. Whether the trial court erred and/or abused its discretion in finding [¶] 3 of the September 18, 2023, Decision, and as discussed in its March 8, 2024, opinion, in favor of the Mounts on Count I of their Counterclaim, which seeks to quiet title, with respect to the portion of land that is within their property depth from Main Street as such finding is not supported by competent evidence, and is contrary to the undisputed and uncontested competent evidence presented by [BM&N].

F. Whether the trial court erred in concluding that [BM&N] was not entitled to an award of monetary damages.

BM&N's brief at 5-6 (parallel numbering omitted).

We review appeals from bench trials pursuant to our well-settled standard of review:

> Our appellate role in cases arising from non-jury trial verdicts is to determine whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in any application of the law. The findings of fact of the trial judge must be given the same weight and effect on appeal as the verdict of the jury. We consider the evidence in a light most favorable to the verdict winner. We will reverse the trial court only if its findings of fact are not supported by competent evidence in the record or if its findings are premised on an error of law. However, where the issue concerns a question of law, our scope of review is plenary.
>
> The trial court's conclusions of law on appeal originating from a non-jury trial are not binding on an appellate court because it is the appellate court's duty to determine if the trial court correctly applied the law to the facts of the case.

*Davis v. Borough of Montrose*, 194 A.3d 597, 605 (Pa.Super. 2018) (cleaned up).

In the underlying matter, the parties brought competing claims to assert ownership over the land on which the subject building resided. First, BM&N sought to eject the Mounts and a portion of the building from what BM&N alleged was its right-of-way property. Ejectment actions are governed by the following principles:

> The plaintiffs' burden in an action in ejectment at law is clear: they must establish the right to immediate exclusive possession. Recovery can be had only on the strength of their own title, not the weakness of defendant's title. The crux of an ejectment action, therefore, rests with the plaintiffs' ability to identify, by a

- 10 -

preponderance of the evidence, the boundaries of a parcel of land to which they are out of possession but for which they maintain paramount title.

*Doman v. Brogan*, 592 A.2d 104, 108 (Pa.Super. 1991) (cleaned up).

The Mounts, meanwhile, lodged a quiet title action encompassing the land on which their restaurant had been erected. "An action to quiet title is designed to resolve a dispute over the title to real estate of which the plaintiff is in possession. The plaintiff bringing a quiet title action has the burden of proof and must recover on the strength of its own title." *Woodhouse Hunting Club, Inc. v. Hoyt*, 183 A.3d 453, 457 (Pa.Super. 2018) (cleaned up). As noted, the court rejected BM&N's ejectment action seeking to remove the Mounts and their building from the disputed area because it quieted title in favor of the Mounts over the contested property.

At the outset, we can quickly dispose of the first issue concerning the trial court's determination that laches barred BM&N from establishing its ejectment action. Although the trial court so held, *see* Trial Court Opinion, 3/8/24, at 7 (pagination supplied), that holding is nugatory given the court's ultimate finding that BM&N's right-of-way onto the Mounts' property ended at the railbed. In other words, because the court found that the Mounts' building did not encroach upon BM&N's right-of-way, there was no need to consider whether ejectment and demolition of the building was alternatively barred by

the equitable doctrine of laches. Accordingly, we need not address the laches issue further.[3]

Turning to the crux of the matter and the next four issues, which all attack the court's determination of the location of the right-of-way, it bears reminding that this case does not concern resolute property lines or a fee simple interest, but rather the location of BM&N's right-of-way on the Mounts' property. Black's Law Dictionary defines "right-of-way" thusly:

> **right-of-way** (18c) **1.** The right to pass through property owned by another. • A right-of-way may be established by contract, by longstanding usage, or by public authority (as with a highway). Cf. easement. **2.** The right to build and operate a railway line or a highway on land belonging to another, or the land so used. **3.** The right to take precedence in traffic. **4.** The strip of land subject to a nonowner's right to pass through. — Also written *right of way*. Pl. **rights-of-way.**
>
> > "'Right of way,' in its strict meaning, is the right of passage over another man's ground; and in its legal and generally accepted meaning, in reference to a railway, it is a mere easement in the lands of others, obtained by lawful condemnation to public use or by

---

[3] Respectfully, our decision not to address this issue is dictated not by our ultimate disposition, as our esteemed colleague suggests in dissent, but by the fact that even if the court erred in applying laches it is of no import as it bore absolutely no effect upon its demarcation of the boundary line. The dissent concludes that "[i]f the Mounts' building is located within BM&N's railroad property, then the doctrine of laches cannot be asserted as a defense against BM&N's action for ejectment." Dissent at 23 (citations omitted). As noted, the trial court determined that the building was **not** within BM&N's right-of-way. The dissent recognizes as much by observing that the court's delineation of the boundary line "precluded a finding that the Mounts' building on Lots 47 was, in part, located within BM&N's property." *Id*. at 5 n.2 (citation omitted). Since the court reached its conclusion without needing to invoke the doctrine of laches, we have no cause to consider whether it erred in referencing that doctrine in its opinion.

> purchase. It would be using the term in an unusual sense, by applying it to an absolute purchase of the fee-simple of lands to be used for a railway or any other kind of a way." 1 Clinton P. Frick, *Abstract and Title Practice* § 118, at 106 (2d ed. 1958).

RIGHT-OF-WAY, Black's Law Dictionary (12th ed. 2024). Our High Court has explained the relationship of the parties involved in a right-of-way in the following manner:

> The owner of the land over which the easement or right-of-way is granted reserves all incidents of ownership which are not conveyed. An easement is a liberty, privilege, or advantage which one may have in the lands of another without profit. It may be created by a covenant or agreement. But it cannot be an estate or interest in the land itself, or a right to any part of it. The right-of-way in this case gave the [holder] nothing more than an easement for use and access.

*Patricca v. Zoning Bd. of Adjustment of City of Pittsburgh*, 590 A.2d 744, 748 (Pa. 1991) (cleaned up).

Over a century earlier, the Supreme Court held that "in a contest involving [a railroad's right-of-way] lines, the company must establish the extent of its ownership in the same manner, and according to the same measure of proof, as others." *Philadelphia & R. R. Co. v. Obert*, 1 A. 398, 400–01 (Pa. 1885). A railroad right-of-way is not a term of art for a uniformly defined area, nor is it "co-terminus with the railroad bed and steel tracks[; rather,] the width of a railroad right-of-way is not a fixed dimension [but] changes with the railroad's needs." *Lehigh Valley Rail Mgmt. LLC v. Cnty. of Northampton Revenue Appeals Bd.*, 178 A.3d 950, 959 (Pa.Cmwlth. 2018) (cleaned up).

- 13 -

In the matter *sub judice*, we first observe that the deeds to the Mounts'

property, dating back to 1871, all describe the lots as "extending thence

westward to the Lehigh Valley Railroad." ***See e.g.***, Plaintiff's Exhibit 5 at 1

(Deed, 11/28/12); ***id***. at 2.  Thus, the plain language of the deeds provides

that the Mounts' property extends to the immoveable physical landmark of

the railroad tracks.[4]  ***See*** RAILROAD, Merriam-Webster Dictionary, available

at https://www.merriam-webster.com/dictionary/railroad (defining "railroad"

as "a permanent road having a line of rails fixed to ties and laid on a roadbed

and providing a track for cars or equipment drawn by locomotives or propelled

by self-contained motors"); ***see also Doman***, 592 A.2d at 110 (noting "as a

general rule, where there is a conflict between courses and distances or

quantity of land and natural or artificial monuments, the monuments prevail"

(cleaned up)).  That is, the Mounts' have title over their properties to the

eastern edge of the railroad tracks.

_____

[4] Our sister court has explained that "'rails' refers to bars of steel forming the track to carry railroad cars[;]" and "the 'rail line' constitutes the 'main tracks of the company's railroad.'"  ***Lehigh Valley Rail Mgmt. LLC v. Cnty. of Northampton Revenue Appeals Bd.***, 178 A.3d 950, 959-60 (Pa.Cmwlth. 2018) (cleaned up).  We equate "railroad," as used as a landmark in the Mounts' deeds, with either the rails or the rail lines, not the amorphous right-of-way for operating those tracks, which necessarily "is broader in scope than a pair of steel railroad tracks."  ***Id***. at 958 (cleaned up).  We recognize that Mr. Bercek interpreted "Lehigh Valley Railroad" as an indication of the adjoining property owner, as opposed to a physical landmark, such that the Mounts' property ended where the railroad's began.  Even if we adopted his interpretation, our conclusion regarding the location of BM&N's right-of-way would remain unchanged.

BM&N, on the other hand, took ownership of the pertinent line of railroad via a quitclaim deed from Consolidated Rail Corporation ("Conrail") in 1996. The deed provided that Conrail "remised, released and quitclaimed" to BM&N "all right, title and interest" of Conrail to the subject property. *See* Complaint, 5/1/15, at Exhibit A (Deed, 8/19/96, at 1). It further detailed, in relevant part, that the conveyance was:

> UNDER and SUBJECT, however, to (1) whatever rights the public may have to the use of any roads, alleys, bridges or streets crossing the premises, (2) any streams, rivers, creeks and water ways passing under, across or through the premises, and (3) any easements or agreements of record or otherwise affecting the premises, and to the state of facts which a personal inspection or accurate survey would disclose, and to any pipes, wires, poles, cables, culverts, drainage courses or systems and their appurtenances now existing and remaining in, on, under, over, across and through the premises, together with the right to maintain, repair, renew, replace, use and remove same.

*Id*. (Deed, 8/19/96, at 2 (some capitalization altered)).

Our Supreme Court explained such deeds as follows:

> Quit-claim deeds, long known to the law, are used when a party wishes to sell or otherwise convey an interest he may think he has in land but does not wish to warrant his title. It does not purport to convey anything more than the interest of the grantor at the time of its execution. The distinguishing characteristic of a quitclaim deed is that it is a conveyance of the interest or title of the grantor in and to the property described, rather than of the property itself.

*Greek Cath. Congregation of Borough of Olyphant v. Plummer*, 12 A.2d 435, 437 (Pa. 1940) (cleaned up).

While none of the deeds defines BM&N's right-of-way, there is no dispute that BM&N possesses a right-of-way to operate its rail service over some

portion of the Mounts' property, which, as noted, otherwise extends to the railroad tracks. Stated simply, the question before the trial court was how far east onto the Mounts' property BM&N's right-of-way for operating its rail line extended, and whether the Mounts' centenarian structure jutted into that right-of-way such that BM&N was entitled to eject the Mounts therefrom.

We have clarified that "[w]hen the precise location of an expressed right-of-way is not fixed or defined by the deed, it is competent for the parties to define a location by subsequent agreement, use[,] or acquiescence." **Flaherty v. DeHaven**, 448 A.2d 1108, 1111 (Pa.Super. 1982). Further:

> Where, as here, the trial court sits as the sole finder of fact, an appellate court will not reverse on appeal unless the trial judge's findings are unsupported by competent evidence. The question of what constitutes a boundary line is a matter of law while the **location** of that boundary line is a matter for the trier of fact. In a boundary dispute case, as in a general action in ejectment, we will not reverse the trial judge's factual findings if they are supported in the certified record.

**Plauchak v. Boling**, 653 A.2d 671, 675 (Pa.Super. 1995) (emphasis in original, cleaned up).

The trial court considered the import of BM&N's quitclaim deed on the underlying dispute in this way:

> The language of the deed appears to be that of a "quitclaim" deed and specifically states that the conveyance is "UNDER and SUBJECT, however, to . . . (3) any easements or agreements of record or otherwise affecting the premises, and to the state of facts which a personal inspection or accurate survey would disclose[.]" There was no dispute at trial that [the Mounts]' building existed in its current location at the time [BM&N] acquired its title in 1996.

Trial Court Opinion, 3/8/24, at 5 (cleaned up, pagination supplied).

We agree that the nature of BM&N's deed is relevant. When BM&N executed the quitclaim deed, the building on the Mounts' land was intact and plainly visible upon inspection. Therefore, the right-of-way could not extend into that building, as BM&N contends, because BM&N took its property subject to the building's existence pursuant to the language of the quit-claim deed.

Although the record refutes the boundary line espoused by BM&N, we must nonetheless determine whether the record supports the trial court's finding that the right-of-way instead ended at the railbed. As we explained, the Mounts did not call an expert to establish the parameters of their quiet title action. BM&N offered an expert in support of its ejectment action, but that expert neglected to include many pertinent measurements and widened the right-of-way without satisfactory explanation across the Mounts' property as compared to the properties to the immediate north. This can be seen

particularly clearly from the birds-eye view provided in Exhibit P-1, with the

Mounts' lots occupying the lower right half of the southernmost block:



We have held:

> [T]he trial court, as the finder of fact, is free to believe all, part or none of the evidence presented. Issues of credibility and conflicts in evidence are for the trial court to resolve; this Court is not

permitted to reexamine the weight and credibility determination or substitute our judgment for that of the fact finder.

*Davis*, 194 A.3d at 605 (cleaned up).

Amidst the dearth of concrete evidence as to the precise location of the right-of-way, the court conducted a site visit, during which it observed the railbed and sub-ballast along the train tracks. It also noted where the right-of-way purportedly existed along the northern neighboring properties based upon the shapes of the abutting buildings. **See** Exhibits P-1, D-93. Ultimately, the court determined that the right-of-way across the Mounts' lots existed along the edge of the sub-ballast, in line with the boundary running by the northern properties, and roughly twelve and one-half feet from the center of the rails.[5] This coincided with where the Mounts had drawn their line on the referenced Exhibit D-95. This demarcation provided for a more consistent right-of-way from the northern neighboring properties and through the Mounts' properties, instead of expanding suddenly along the Mounts' property and into their one-hundred-year-old structure.

This Court long ago held:

It is true that a railroad company cannot acquire title by adverse possession nor can a claimant against such company[,] but where it is uncertain as to how much land was embraced in the original

_____

[5] It is plain from the record that the trial court was not simply "persuaded by the Mounts' use of a PVC pipe to determine the location of the property line," Dissent at 36-37, but rather considered the totality of the evidence in light of its own observations during the site visit, and determined that the sub-ballast was twelve and one-half feet from the center of the rails. As such, we understand that the PVC pipe was a useful visual aid; it was not the basis for the court's decision.

- 19 -

grant of the right[-]of[-]way, the existence of a visible demarcation between the line of the railroad company's property and the abutting owner would be *prima facie* evidence that the respective titles were separated by said line and that the line was acquiesced in by the railroad and the abutting property holder.

***Pennsylvania R. Co. v. Guthrie***, 66 Pa.Super. 470, 472 (1917).

Here, the court's observation of a visible demarcation, *i.e.*, the railbed sub-ballast, was a proper means of ascertaining the bounds of BM&N's right-of-way onto the Mounts' property. As indicated, the Mounts established their legal title over their property as it extends to the railroad tracks based upon the historical deeds. BM&N bore the burden of establishing the bounds of its right-of-way onto the Mounts' property in attempting to eject the Mounts from a portion of their lot and long-standing building. Ultimately, it failed to convince the court that its right-of-way extended beyond the visible railbed sub-ballast, particularly when its proposed boundary line drastically deviated from those of the northerly properties.[6]

Furthermore, BM&N has not demonstrated to us that it should be given another opportunity to attempt to succeed on its action to eject the Mounts

---

[6] The Dissent opines that our analysis indicates that we are "concerned that the boundary line, as determined by Mr. Bercek, was not drawn in a straight line[.]" Dissent at 41. That is not our concern. Certainly, we recognize that a right-of-way need not be uniform. ***See Lehigh Valley Rail Mgmt. LLC***, 178 A.3d at 959 (explaining that "the width of a railroad right-of-way is not a fixed dimension [but] changes with the railroad's needs" (cleaned up)). However, it is also the burden of the railroad to establish its right-of-way "in the same manner, and according to the same measure of proof, as others." ***Obert***, 1 A. at 400–01. BM&N failed to meet that burden and, without explanation for the deviations, we discern no error in the trial court's consideration of the width of the immediately neighboring portions of the right-of-way for context in placing the boundary line *sub judice*.

from a 1900s structure after having twice failed to prove its case in the trial court. Rather, based on the foregoing, we conclude that the trial court's finding that BM&N failed to prove its ejectment action and that its right-of-way extended only to the end of the sub-ballast is supported by the record.

Accordingly, we affirm the entry of judgment against BM&N and in favor of the Mounts, based upon the trial court's September 18, 2023 verdict.[7]

Judgment affirmed.

Judge Stabile joins this Opinion.

Judge Olson files a Dissenting Opinion.

Judgment Entered.

_____

Benjamin D. Kohler, Esq.
Prothonotary

Date: 10/1/2025

---

[7] In BM&N's final issue, it argues that because we should reverse the trial court's placement of the right-of-way, we should also remand for a hearing on damages related to the deconstruction of the Mounts' building and remediation of the Mounts' trespass. Since we affirm, we decline its request to remand.